IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : CRIMINAL INDICTMENT NO.: |
| v. | : 1:15-cr-00109-AT-JSA |
| | : |
| RYAN VINCENT HILL | : |

**ORDER AND REPORT AND RECOMMENDATION**

On February 27, 2015, gunmen robbed a bank in Atlanta, Georgia. Later that day, various suspects fled from police in a white Mercedes. Shortly after losing the Mercedes in a high-speed chase, the officers found it parked in a garage. The police searched the car without a warrant, and found papers implicating the Defendant in the robbery. Among various other motions pending before the undersigned, Defendant now seeks to suppress the fruits of this warrantless search.

For the reasons stated below, the Court **RECOMMENDS** that Defendant's Motions to Suppress [80] [240] be **DENIED**.[1] The Court also **DENIES** the Government's Motion for Leave to Supplement [257] and **DEFERS** the Defendant's Motion to Sever [82] to the District Judge for determination at trial.

---

[1] Document 240 was docketed as a supplemental motion to suppress, but instead is simply Defendant's post-hearing brief in support of his original motion. Thus, in effect, there is a single motion to suppress pending with post-hearing briefs in support.

## **FACTS**

On the morning of February 27, 2015, several suspects robbed a Wells Fargo Bank in Atlanta.  *See* Transcript of December 2, 2015 Evidentiary Hearing [238]) ("Tr.") at 28-29, 51.  Bank employees inserted GPS tracking devices in the money packs given to the robbers, which shortly after the robbery led Atlanta Police Department ("APD") officers and other law enforcement agents to a residential address in Ellenwood, Georgia.  *Id.* at 30-33.  The investigators found several items of evidence at this location, including stolen money, guns, the track-packs, and some clothing.  *Id.*

Shortly after arriving at the Ellenwood residence, the police saw a white 2012 Mercedes AMG sports car flee the scene at high speed.  *Id.* at 33-34.  This was not the same vehicle as was used as the getaway car for the robbery, which was a white SUV.  *Id.* at 29, 51.  Nevertheless, the car contained several individuals that matched the very general racial and gender description of the robbers, and conspicuously fled at high speed from the investigation scene.  *Id.* at 33.  The officers chased the Mercedes with blue lights activated, but the Mercedes sped up and eventually lost the pursuing officers on two occasions.  *Id*. at 33-37.

After chasing the Mercedes into a garage on Mount Zion Road, the investigators discovered it parked in a parking spot.  *Id.* at 37-39.  About ten minutes had past since the car was first spotted and the high-speed chase began.

*Id.* at 38.  The car was unoccupied, turned off, unlocked (but with closed doors), and one open window and a flat tire.  *Id.* at 37-39.  These events all occurred within approximately one hour of the robbery.  *Id.* at 40.

APD Sergeant Carven Tyus, who testified at the hearing, was on scene to investigate the Mercedes.  *Id.* at 38, 40.  Sgt. Tyus had been advised via radio of the facts regarding the robbery and the evidence obtained at the Ellenwood residence.  *Id.* at 29-30, 51.  Shortly after arriving on the scene, FBI agents reviewed the parking garage surveillance footage.  *Id.* at 38-39.  This footage showed the Mercedes speeding into the garage and abruptly parking *Id.* at 38-39.  Three black males then ran from the Mercedes, entered a parked van, and drove away.  *Id.* at 38-40. Sgt. Tyus directed other officers to run a records check on the license plate, which indicated that the car was registered to a woman at an Atlanta address not associated with the apartment complex.  *Id.* at 40.  While it had not been reported as stolen, Sgt. Tyus suspected that the car might be stolen and that the owner might not yet know it was missing, as it is common for robbers to steal getaway cars.  *Id.* at 41-42.  Sgt. Tyus also concluded that the car had been abandoned.  *Id.* at 38.

Sgt. Tyus decided to impound and search the Mercedes.  *Id.* at 42, 48.  He searched the vehicle as required when impounding a vehicle, but also believed that the car had been abandoned and that there would be evidence relating to the

robbery, including possibly "weapons, clothing that they may have discarded," "DNA," and "fingerprints" of the drivers. *Id.* at 84. Sgt. Tyus understood, however, that various items of evidence including money and some guns and clothing and the track packs themselves had already been discovered at the Ellenwood location. *Id.* The police apparently did not discover weapons, clothes, DNA or fingerprints, or at least no mention was made of such a discovery at the evidentiary hearing. Rather, the police found rental papers in the glove box of the car that tied the Defendant to the rental of the white SUV that had been used as the robbery getaway car. *Id.* at 51-52, 62.

## DISCUSSION

The Fourth Amendment to the United States Constitution protects the right of persons to be free from unreasonable searches and seizures. U.S. CONST. AMEND. IV. "It is a 'basic principle of Fourth Amendment law' that searches and seizures inside a home [or other private property] without a warrant are presumptively unreasonable." *Payton v. New York*, 445 U.S. 573, 586 (1980); *United States v. Santa*, 236 F.3d 662, 668 (11th Cir. 2000). Upon a motion to suppress evidence garnered through a warrantless search and seizure, the burden of proof as to the reasonableness of the search rests with the prosecution. *United States v. Freire*, 710 F.2d 1515, 1519 (11th Cir. 1983) (*citing United States v. Impson*, 482 F.2d 197 (5th Cir. 1973)). Thus, the government must demonstrate

that the challenged action falls within one of the recognized exceptions to the warrant requirement, thereby rendering it reasonable within the meaning of the Fourth Amendment. *Vale v. Louisiana*, 399 U.S. 30, 34 (1969); *United States v. Jeffers*, 342 U.S. 48, 51 (1951); *Friere*, supra. The Government here asserts that the search was permissible on three theories: (1) pursuant to the so-called automobile search exception, (2) because the Mercedes was "abandoned," and (3) as an inventory search.

### A. Automobile Exception

Under the automobile exception, a warrantless search of a car is constitutional if (a) the car is "readily mobile," and (b) probable cause exists to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299–1300 (11th Cir. 2011); *United States v. Watts*, 329 F.3d 1282, 1286 (11th Cir. 2003).

#### i. *Ready Mobility*

Defendant argues that this exception does not apply because the Mercedes AMG had a flat tire and therefore was not "readily mobile." Being "readily mobile," however, does not require that a vehicle be *immediately* mobile. Courts have repeatedly applied the automobile exception as to vehicles immobilized by fixable mechanical problems. *See, e.g., United States v. Fields*, 456 F.3d 519, 524 (5th Cir.2006) (applying automobile exception after car had crashed into a wall,

because "even where an automobile is not immediately mobile at the time of the search, 'the lesser expectation of privacy resulting from its use as a readily mobile vehicle justifie[s] application of the vehicular exception.'") (*quoting California v. Carney*, 471 U.S. 386, 391 (1985); *United States v. Mercado*, 307 F3d 1226, 1229 (10th Cir. 2002) ("We are of the view that mere temporary immobility due to a readily repairable problem while at an open public repair shop does not remove the vehicle from the category of 'readily mobile.'"); *United States v. Rommann*, 902 F.2d 1570 (6th Cir. 1990) (unpublished) ("The only remaining question is whether the fact that the truck was temporarily up on a jack with a wheel off dictates a finding that the search was illegal. We conclude that it does not . . . .") (*citing United States v. Markham*, 844 F.2d 366, 367-68 (6th Cir. 1988)); *United States v. Vega-Cervantes*, No. 1:14-CR-234-WSD-JFK, 2015 WL 4877657, *10-*11 (N.D.Ga. August 13, 2015) (vehicle needing to be jump-started and which was on a lift for repairs was, nevertheless, "readily mobile" for purposes of application of the automobile exception).

After all, the Supreme Court has made clear that:

> [A]lthough ready mobility alone was perhaps the original justification for the vehicle exception, our later cases have made clear that ready mobility is not the only basis for the exception. The reasons for the vehicle exception, we have said, are twofold. [South Dakota v. Opperman ], 428 U.S. [364], at 367. 'Besides the element of mobility, less rigorous warrant requirements govern because the expectation of privacy with respect to one's automobile is significantly less than that

relating to one's home or office. *Ibid*. *Carney*, 471 U.S. at 391.[2]

Under these standards, Defendant's Mercedes was "readily mobile." A flat tire can easily and quickly be fixed and replaced with a spare, and may not even prevent the car from being driven a short distance away. Indeed, the record suggests that the Mercedes did not just suddenly stop and become immobile on the road. The drivers were obviously able to pull it into a parking spot, which suggests that the car was operational and able to be controlled at least to a substantial degree. The Court has no difficulty finding that the "readily mobile" prong of the automobile exception applies.

  ii.   *Probable Cause*

"Probable cause for a search exists when under the totality of the circumstances 'there is a fair probability that contraband or evidence of a crime will be found in a particular place.'" *United States v. Goddard*, 312 F.3d 1360, 1363 (11th Cir. 2002) (*quoting Illinois v. Gates*, 462 U.S. 213, 238 (1983)). Defendant argues that Sgt. Tyus necessarily lacked probable cause to search the Mercedes AMG, as Sgt. Tyus already knew that guns, money, clothes, and track packs had been recovered at the Ellenwood residence, and he admitted that he did

---

[2] As an example of a vehicle that would not be "readily mobile," the Supreme Court suggested the hypothetical of a motor home mounted on blocks or connected to public utility lines. *See Carney*, 471 U.S. at 393-394 n. 3.

not necessarily expect to find any guns, money, license plates, track packs, or other "contraband" in the Mercedes. *See* Tr. at 72, 81.

Sgt. Tyus nevertheless testified that he believed he had probable cause to believe that some evidence would be found in the Mercedes, including DNA and fingerprints to identify the individuals who had been driving this car. *See* Tr. at 84.[3]  The Court agrees that the facts objectively show the existence of probable cause. The officers had more than sufficient reason to believe that the occupants of this car were connected to the robbery, in that the car sped away from the immediate vicinity of the Ellenwood residence just as the police began investigating it; the car contained three individuals matching at least the general

---

[3] Defendant argues that Sgt. Tyus only testified to these specifics "[u]pon being fed the right answer from the prosecution on re-direct . . . ." Pl. Br. [240] at 5. That is not the Court's recollection of the testimony or its interpretation of the transcript. Defendant's counsel on cross-examination asked specifically about whether Sgt. Tyus expected to find guns, money, license plates, track packs, or contraband in the car, and he testified in the negative. Tr. at 72, 81. Government counsel on re-direct then asked Sgt. Tyus more generally to clarify whether he believed he had probable cause that evidence would be found in the car, and he said yes. *Id.* at 83-84. Sgt. Tyus then, without being prompted, offered various specific examples, including weapons, "clothing they may have discarded," fingerprints and DNA. *Id.* Sgt. Tyus's reference to possibly finding weapons was somewhat inconsistent with his testimony on cross-examination, in which he stated that he did not expect to find any guns in the car. *See id.* at 71. But the Court does not otherwise find that Sgt. Tyus's answers were fed to him by the prosecutors. In any event, what Sgt. Tyus subjectively believed might be found in the car is immaterial, because "[i]t is well-settled that an officer's subjective motivations do not affect whether probable cause existed." *Miller v. Harget*, 458 F.3d 1251, 1260 (11th Cir. 2006).

racial and gender description of the robbers; the suspects proceeded to lead law enforcement on a high speed chase even after activation of blue lights; and upon parking the car the suspects ran away into what was apparently yet another getaway car that had been waiting for them.[4]

The facts known to Sgt. Tyus also established probable cause that evidence would be found within the car. At a minimum, it was highly reasonable to assume that some evidence could be found within the car as to the identity of the drivers, including DNA, fingerprints or documentary records. Moreover, there was a fair probability that the robbers did not dispose of every single item of clothing they used or every single dollar bill obtained in the robbery in the short window of time they apparently spent at the Ellenwood residence, and may have left something behind as they urgently fled from the Mercedes to the waiting van.

Thus, Sgt. Tyus's search was justified under the automobile exception and Defendant's motion should be denied on this basis.

---

[4] Even if the police lacked probable cause to connect the car to the robbery, which they did not, they still had clear evidence to connect this car to fleeing and attempting to elude law enforcement under O.C.Ga. § 40-6-395.

### B. Search of Abandoned Property

"[A]n individual who abandons property forfeits any reasonable expectation of privacy in the property." *United States v. Williams*, 194 F.3d 100, 109 (D.C. Cir. 1999). Much like the determination of probable cause, whether someone has abandoned property is to be determined objectively based on the totality of facts known to the officers. *See United States v. Pirolli*, 673 F.2d 1200, 1204 (11th Cir. 1982).

As the Government points out, several cases have found drivers to have abandoned their cars and relinquished any property interest where they flee their car on foot to evade the police. *See United States v. Falsey*, 566 Fed. App. 864, 867-68 (11th Cir. 2014) (suspect deemed to have abandoned his car for Fourth Amendment purposes when he drove down a street at high speed believing he was being chased by the police, parked in a marked spot, and then ran off into the woods); *United States v. Jefferson*, 451 Fed. App. 833, 834 (11th Cir. 2011) (suspect deemed to have abandoned his car by running away during a traffic stop); *United States v. Williams*, 569 F.2d 823, 824-26 (5th Cir. 1978) (suspect abandoned his trailer when he unhooked it from his truck at a rest stop and then drove away while being pursued by federal agents); *United States v. Edwards*, 441 F.2d 749, 751-753 (5th Cir. 1971) (a suspect abandoned his car when he left it running, with the keys in the ignition, and ran away from the police). Other circuit

courts have found similarly. *See United States v. Vasquez*, 635 F.3d 889, 892-894 (7th Cir. 2011) (concluding that a defendant abandoned his car when he sped away from police, and then left it in a Walmart parking lot before fleeing on foot); *United States v. Walton*, 538 F.2d 1348, 1351, 1354 (8th Cir.1976) (holding that a defendant "had no standing to complain of [the warrantless] examination and search" of his car, where he left it parked on a public street, with its doors unlocked and its windows down, as he fled from the police); *United States v. D'Avanzo*, 443 F.2d 1224, 1225–26 (2d Cir.1971) (upholding a finding of abandonment where the defendant parked the car he was driving on a residential street and then fled from the police into a nearby wooded area).

Defendant argues that he cannot be accused of abandonment by simply parking a car in a marked spot, closing the doors, and leaving it. That is true, but this does not include all of the facts. All of this had happened after the police chased the Mercedes into the parking lot. *See* Tr. at 37. And then, according to video surveillance, the occupants ran away from the car and hopped into a another apparent getaway vehicle. Tr. at 37-40. The occupants left the doors unlocked (but closed), and with a window open. *Id.* Further suggesting that the Mount Zion Road location was just a place to stop and switch vehicles, the police had confirmed that the vehicle was registered to a different address. *Id.* at 40-41.

The Defendant points out that the only two binding cases cited by the

Government are the pre-1981 5th Circuit cases *Williams* and *Edwards*[5], and those cases are factually distinguishable.  Clearly, leaving keys in the ignition of a running car while running away from the police (*Edwards*), and speeding off onto a highway while leaving an unlocked trailer behind at a rest stop (*Williams*), are stronger fact patterns supporting abandonment.  Nevertheless, while not binding, several persuasive Eleventh Circuit and other Circuit decisions are highly similar to this case, and consistently find in favor of abandonment.  In both *Falsey* and *Vasquez*, for example, the suspects parked their car in a marked spot, left the door closed, and ran off before the police even arrived on the scene.  In the end, the totality of the facts weigh in favor of a finding of abandonment here too.  The occupants of the Mercedes entered the parking lot under hot pursuit, and then ran from that car into another one in which they apparently escaped.  While they closed the doors, they left them unlocked and a window open.  The most logical conclusion is that the occupants understood that they were leaving their car behind and, because of the obvious police surveillance that would surround the car within a short time, that they did not intend to return.  Thus, not only is a finding of abandonment strongly supported by the weight of the persuasive authorities, it is the most straightforward conclusion from the particular fact pattern here.

---

[5] *See Bonner v. City of Prichard*, 661 F.2d 1206, 1207 (11th Cir. 1981) (*en banc*) (Published decisions of the former Fifth Circuit issued prior to October 1, 1981 are deemed to be binding precedent in the Eleventh Circuit).

Suppression should be denied on this independent basis.

### C.     Inventory Search

The Supreme Court has recognized the reasonableness of inventory searches when executed in accordance with standard police practice. *See e.g., South Dakota v. Opperman*, 428 U.S. 364, 376 (1976); *see also United States v. Edwards*, 577 F.2d 883, 893 (5th Cir.) (*en banc*), *cert. denied*, 439 U.S. 968 (1978). Judicial tolerance of such searches derives from the need to protect the owner's property, to protect the police from disputes over lost property and to protect the police and the public from potential danger and nuisances. *Opperman*, 428 U.S. at 369; *see also United States v. Prescott*, 599 F.2d 103, 105 (5th Cir.1979). To conduct a routine inventory check, law enforcement officials need not obtain a warrant. *See United States v. Bosby*, 675 F.2d 1174, 1179 (11th Cir.1982). However, "[i]nventory searches must be limited to effectuation of the recognized purposes, for which they are conducted and they may not be used as a pretext for intrusive investigatory searches that would otherwise be impermissible." *Prescott*, 599 F.2d at 105. One of the strongest indications that an inventory check was indeed conducted for legitimate purposes is evidence that such a search is a standard practice for the particular law enforcement agency. *Id.* at 106.

The defense urges the Court to find that the search was not an inventory or "caretaker" search at all, but rather a pretext for a pure investigative search.

Indeed, the Defendant argues that it is hypocritical for the Government to simultaneously argue that the search was merely an inventory search while at the same time arguing that Sgt. Tyus had probable cause to believe that evidence would be found within the car.  The Government's reliance on these two separate motives is not fatal, however.  While the police may not conduct an inventory search in bad faith or solely for investigative purposes, a search may be justified by legitimate inventory purposes even if the police also have investigative interest in the search.  *See, e.g., United States v. Bohway*, 992 F.2d 229, 231 (9th Cir. 1993).

The proof on this issue is much more muddled.  On the inventory form, Sgt. Tyus recorded the reason for impounding the vehicle as "vehicle involved in bank robbery."  Gov't Ex. 1.  At the hearing, however, Sgt. Tyus testified that he believed he was authorized to impound the vehicle as "abandoned," and he referred to APD procedure No. 30-20 as authorizing the impoundment of abandoned vehicles.  Tr. at 49-50.  However, the Government later introduced that policy (No. 30-20) as Exhibit 2.  This policy is the APD policy on search and seizure and it does not specifically discuss the circumstances and procedures by which property may be impounded and searched.  The policy simply generally states that abandonment is a fact-specific determination and that abandoned property "is not subject to policies governing searches with or without a warrant."  Ex. 2 at 13.

The introduction of and reference to the wrong policy was apparently just an

oversight.  After the hearing, the Government moved to supplement the record with the correct APD policy governing impoundments. [257].  Defendant opposes this motion to supplement, however. The Court finds no good cause for re-opening the factual record of this case at this juncture, months after the evidentiary hearing was set, and well after Sgt. Tyus's testimony.  The Court thereafter denies the Government's Motion to Supplement [257].

The Court is therefore left with a record containing ambiguities as to the basis for impoundment, and which fails to show that the APD followed its procedures.  Therefore, the Court finds that the Government has not met its burden of showing the propriety of an inventory search.  This finding is offered solely in the event that the undersigned's findings on the automobile exception and abandonment are rejected, because otherwise the propriety of an inventory search is moot.  As explained above, the undersigned concludes that the search was justified under the automobile exception and, independently, that Defendant lacks standing to contest the search on grounds of abandonment.  Either of these findings, if accepted, would necessitate denial of Defendant's motion to suppress notwithstanding the Government's failure of proof on the question of an inventory search.

## **CONCLUSION**

Thus, the Court **RECOMMENDS** that Defendant's Motions to Suppress [80] [240] be **DENIED**.

The Court further **ORDERS** that the Government's Motion to Supplement [257] is **DENIED**, that Defendant's Motion to Sever [82] is **DEFERRED TO TRIAL**.[6]  Unless other procedures or deadlines are ordered by the trial judge, the Government must disclose no later than 21 days before trial any statements of non-testifying co-defendants it intends to introduce in any trial in which Defendant is a party.  Defendant may then further perfect his Motion to Sever by filing a supplement memorandum within seven (7) days of the Government's disclosure.  The Motion may then be decided by the trial judge or referred back to the undersigned.

---

[6] Defendant's Motion to Sever [82] is premised on the possibility of a so-called "Bruton problem," i.e., the suspicion that some co-defendants may have given statements that incriminate Defendant, which may be introduced against them in a joint trial in which Defendant would be unable to cross-examine his co-defendant.  This motion is not ripe to adjudicate now, as it is unknown at this juncture what Defendants will continue to trial and what statements will be introduced by the Government.

Otherwise, this matter is **READY FOR TRIAL**.

**IT IS SO ORDERED AND RECOMMENDED** this 28th day of March, 2016.

_____
JUSTIN S. ANAND
UNITED STATES MAGISTRATE JUDGE