1             IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF GEORGIA
2                     ATLANTA DIVISION

3   UNITED STATES OF AMERICA,        :
                                     :
4   vs.                              :   DOCKET NUMBER
                                     :   1:15-CR-109-AT-3
5   RYAN VINCENT HILL,               :
                                     :   ATLANTA, GEORGIA
6            DEFENDANT.              :   JANUARY 23 - 26, 2017

7

         **TRANSCRIPT OF JURY TRIAL (EXCERPTED) PROCEEDINGS**
8              **BEFORE THE HONORABLE AMY TOTENBERG**
                 **UNITED STATES DISTRICT JUDGE**
9                     **VOLUME III OF IV**

10

APPEARANCES OF COUNSEL:

11

        **FOR THE GOVERNMENT:**
12
        JOHN S. GHOSE
13      RICHARD MOULTRIE
        UNITED STATES ATTORNEY'S OFFICE
14

15      **FOR THE DEFENDANT:**

16      ALBERT L. NORTON, JR.
        NORTON & ASSOCIATES, P.C.
17

18

19

20

21

22      *MECHANICAL STENOGRAPHY OF PROCEEDINGS AND COMPUTER-AIDED*
                     *TRANSCRIPT PRODUCED BY:*
23
    *OFFICIAL COURT REPORTER:*        *SHANNON R. WELCH, RMR, CRR*
24                                    *2394 UNITED STATES COURTHOUSE*
                                      *75 TED TURNER DRIVE, SOUTHWEST*
25                                    *ATLANTA, GEORGIA  30303*
                                      *(404) 215-1383*

                  UNITED STATES DISTRICT COURT
                  OFFICIAL CERTIFIED TRANSCRIPT

1                  **I N D E X   T O   V O L U M E S**

2

3        VOLUME I                    PAGES 1 - 101

4        VOLUME II                   PAGES 102 - 347

5        VOLUME III                  PAGES 348 - 455

6        VOLUME IV                   PAGE  456 - 463

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1          **I N D E X   T O   P R O C E E D I N G S**

2

3                                                              **PAGE**

4                        **JANUARY 23, 2017**

5    PRELIMINARY INSTRUCTIONS

6         by The Court                                          16

7    OPENING STATEMENT

8         by Mr. Moultrie                                       27
          by Mr. Norton                                        32
9
                      **THE GOVERNMENT'S CASE**
10       **WITNESS**                                          **PAGE**

11   WILLIE HARPER

12        Direct Examination
          by Mr. Ghose                                         47
13        Cross-Examination
          by Mr. Norton                                        78
14
     EDWARD SMART
15
          Direct Examination
16        by Mr. Ghose                                         80
          Cross-Examination
17        by Mr. Norton                                        88

18                       **JANUARY 24, 2017**

19   VADA FANIEL

20        Direct Examination
          by Mr. Ghose                                        112
21        Cross-Examination
          by Mr. Norton                                       144
22
     AYRION CHANDLER
23
          Direct Examination
24        by Mr. Ghose                                        153
          Cross-Examination
25        by Mr. Norton                                       165

                    UNITED STATES DISTRICT COURT
                    OFFICIAL CERTIFIED TRANSCRIPT

```
 1   (...cont'd...)
```

```
 2        WITNESS                                    PAGE

 3   JERALD LAWSON

 4        Direct Examination
            by Mr. Ghose                             178
 5        Cross-Examination
            by Mr. Norton                            194
 6        Redirect Examination
            by Mr. Ghose                             198
 7
     JAMIR DENSON
 8
          Direct Examination
 9          by Mr. Moultrie                          205
          Cross-Examination
10          by Mr. Norton                            231

11   KAYODE ADELEYE

12        Direct Examination
            by Mr. Moultrie                          254
13        Cross-Examination
            by Mr. Norton                            308
14        Redirect Examination
            by Mr. Moultrie                          340
15
                    JANUARY 25, 2017
16
     JORDAN PEYTON
17
          Direct Examination
18          by Mr. Ghose                             359
          Cross-Examination
19          by Mr. Norton                            365
          Redirect Examination
20          by Mr. Ghose                             374

21                        * * *

22   CHARGE CONFERENCE                               348

23   CLOSING ARGUMENT

24        by Mr. Ghose                               388
          by Mr. Norton                              397
25        by Mr. Ghose                               425
```

1   (...cont'd...)

2   CHARGE

3      by The Court                         433

4                **JANUARY 26, 2017**

5   VERDICT                             456

6   POLLING OF THE JURY           457

7   CERTIFICATE                    464

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    **PROCEEDINGS OF JANUARY 25, 2017.**

2         THE COURT:  Good morning.  Please have a seat.  I

3    hope I haven't gotten anyone sick spewing forth my coughing

4    here.

5         Okay.  I gave you via Ms. McConochie the jury

6    instructions.  Obviously, the first highlight I brought to your

7    attention on Page 2 was just simply dependent on whether

8    Mr. Hill testified or not.  And we'll modify according to what

9    he decides to do.

10        And the one on Page 9 -- I just wasn't sure the form

11   of the indictment was that was being given.  I wanted to see it

12   again.  And then I thought it might be a -- is it confusing to

13   use the word separate?  It is a separate federal crime on

14   that -- saying to use or carry a firearm if you look on Page 9,

15   that language.

16        MR. GHOSE:  We don't think it is confusing, Your

17   Honor.

18        THE COURT:  Okay.  So what did you mean exactly?  I

19   mean, what does it mean there where we're just -- we're

20   actually only talking about one crime we're charging him on or

21   you're charging him on?

22        MR. GHOSE:  I mean, I think from a juror's

23   perspective, it is confusing that there is an armed bank

24   robbery and then there is a use of a gun count.  I think it

25   helps to say, look, those are two separate counts, those are

1   two separate offenses.

2         THE COURT:  And I think that's true except we have

3   just been talking about Count 3 on Page 8.  It probably doesn't

4   matter.

5         But do you have any view, Mr. Norton?  I mean, this

6   is probably dancing on the head of a pin.

7         MR. NORTON:  Well, maybe not.  You make a good point.

8   The bottom of Page 8 is directly talking about Count 3, and

9   then the next section is a separate crime.  You could just say

10   it is a separate federal crime distinct from armed robbery to

11   use and carry a firearm, if you wanted to incorporate the

12   concept.

13         THE COURT:  Well, I think it explains it later on in

14   the paragraph -- the full paragraph after 1, 2.  I'll just

15   leave it.

16         The reason -- I understand the Government's argument

17   as to *United States vs. Hector*.  But I really think it is not

18   either controlling or applicable here.

19         First of all, the *United States vs. Hector* is looked

20   at on a harmless error basis in terms of its affirmance even

21   where there is an error.

22         Secondly, the conspiracy charge there related

23   specifically to the bank robbery.  The conspiracy here is --

24   relates to a 1951 charge of interference of commerce by threats

25   or violence, which doesn't itself reference the use of a

1    weapon.

2         But most of all -- and it is just really -- this is a

3    harmless error affirmance of a verdict.  And I think that

4    *Rosemond* really does control what the -- what the jury

5    instructions should be here.  So I'm not going to give the

6    *Pinkerton* -- requested *Pinkerton* charge.

7         Are there any -- I know the Government objects to

8    that.  I note your objection --

9         MR. GHOSE:  Yes.

10        THE COURT:  -- in advance.  Because you very

11   forcefully argued it yesterday.

12        MR. GHOSE:  We just reserve our objection.

13        THE COURT:  That's fine.  Are there any other

14   objections to the proposed charge?

15        MR. NORTON:  No, Your Honor.

16        MR. MOULTRIE:  No, Judge.

17        THE COURT:  Okay.  Good.  I understand -- as to the

18   verdict form, I didn't hear from the defendant on that.  I know

19   that the Government's expressed its objection to the

20   defendant's proposed verdict form.

21        MR. NORTON:  I think the last version I saw of the

22   Government's form was the one we started out with.

23        THE COURT:  Right.  So I wanted to -- they are

24   objecting to your proposed verdict form, and I wanted to know

25   what your response to their objection was.

1         MR. NORTON:  Well, what I was trying to get at with

2    that form -- and I'm not necessarily wed to that exact thing.

3    But the concept that I was trying to get into it is there is a

4    distinction between the use of brandishing.  There is a

5    difference in sentence, of course, five versus seven years.

6         Now, I realize that the evidence in the case mostly

7    points towards brandishing.  However, if the jury were to make

8    a distinction in time as to when -- if they were to find him

9    guilty and if they were to find him guilty because he -- there

10   was not a point in time when he -- what is the language?  Too

11   late to be reasonably able to walk away.  If they figure out

12   what point in time that was and decide that he is guilty

13   because he didn't walk away when he should have, then I suppose

14   we could also say, well, at that point in time was the gun

15   being used or was it also being brandished?

16        So I think the idea of *Rosemond* incorporates this

17   idea of time about when one walks away -- discovery and the

18   time it is too late to reasonably walk away.  So if that is a

19   possibility --

20        THE COURT:  I think it is theoretically a

21   possibility.  But in this case it looks like from the videos

22   just in terms of reality that it is an all or nothing

23   proposition because they had their guns out -- his codefendants

24   did from the get-go when they walked into the bank.

25        MR. NORTON:  Let's say that the jury decides, you

1   know, he didn't have advance knowledge.  But you remember the

2   video and still when they are walking in the vestibule.  And

3   Mr. Hill comes in last, and Mr. Brown is standing there, and

4   you can't see the gun at that point.

5          It looks like he is kind of doing this.  He has got

6   it down here.  He has got it down here for a quite a bit as

7   Hill gets well into the place.

8          There is debate about whether or not Hill would have

9   seen it at that point.  Well, was he brandishing that firearm?

10  I think a juror could conclude that, well, he saw it then.  It

11  was only being used at that point, and he should have walked

12  away at that point.

13         THE COURT:  What about that last argument?

14         MR. MOULTRIE:  Judge, these are all defense arguments

15  in terms of the theories of how the case occurred, all of which

16  Mr. Norton will be able to argue appropriately.  But there is

17  no need to tinker with the verdict form.  The verdict form that

18  we submitted is straight out of the pattern instructions.

19         I think we attached the sample verdict form to our

20  reply to Mr. Norton's response to our trial brief.  And if not,

21  Judge, I have a copy.

22         THE COURT:  I mean, I have what you originally

23  proposed.  Is that what you attached?

24         MR. MOULTRIE:  Yes.

25         THE COURT:  I have the original proposal.  And then

1    you had Judge Ross' verdict form.  And you didn't have anything

2    else other than that.

3              MR. GHOSE:  Your Honor, I believe the --

4              THE COURT:  You had the -- I know I had the original

5    one that you submitted.

6              MR. GHOSE:  Well, the other attachment to the reply

7    to the trial memorandum, in addition to Judge Ross' verdict

8    form, is the pattern instruction for brandishing.  And I wanted

9    to just make it clear that that pattern instruction --

10             THE COURT:  I just want to see where --

11             MR. MOULTRIE:  Judge, we have the pattern instruction

12   book.  I'll get it for you.

13             THE COURT:  Because what I have is just simply -- at

14   least what I printed was Exhibits 1, which was Judge Ross', and

15   2, which was your *Pinkerton* charge.

16             MR. MOULTRIE:  So, Your Honor, the -- you can just

17   borrow my pattern book, Eleventh Circuit 2016 edition.  It is

18   going to be at Page 236.  It is a special verdict form.

19             THE COURT:  I'm sorry.  Are you asking me to look at

20   35.2?

21             MR. MOULTRIE:  Just the special verdict form, Your

22   Honor, where the specific reference is made to how the wording

23   of the finding as to brandish is recommended to be worded.

24             THE COURT:  We, the jury, having found the defendant

25   guilty of the offense charged further find that with respect to

1   count -- the firearm was -- and then it has in brackets

2   brandish or discharge?

3            MR. MOULTRIE:  Yes.

4            THE COURT:  I guess he might argue that that should

5   be brandish, possessed.

6            MR. MOULTRIE:  No.  Judge, I'm suggesting that is not

7   correct.  Because if you look at the first finding -- the first

8   finding of guilt or innocence, it is as to the use or carrying

9   of a firearm.

10           THE COURT:  Yes.

11           MR. MOULTRIE:  So only after they have decided guilt

12  or innocence on that question do they even reach the question

13  of whether -- right.

14           And the only other point I would make, Your Honor, is

15  I think there's part of the pattern instruction that Mr. Norton

16  continues to miss.  It is a jumbled-up pattern instruction.  So

17  it makes sense.  I fully acknowledge that.

18           But this is important.  There is no requirement that

19  the jury find that Mr. Hill had advance knowledge that a

20  firearm would actually be brandished.  That is not a finding

21  that the jury has to make.  And that is what you're going to

22  instruct them.  It is in the pattern instruction you have

23  provided us.

24           So this notion of any additional fact finding that

25  the jury needs to do is just not proper based on the pattern

```
 1    instruction that you'll be giving the jury.  They are going to
 2    make a decision on guilt or innocence in use and carrying.  And
 3    then there only has a finding that a participant brandished a
 4    firearm.
 5            THE COURT:  Okay.  Well --
 6            MR. MOULTRIE:  It is just that simple.
 7            THE COURT:  I think the only thing I would say is
 8    that I'm comfortable at this juncture with the pattern charge.
 9    I think we have to have the note that is in the actual language
10    here which your proposed verdict form didn't have where it
11    says, note, if you find the defendant not guilty as charged in
12    count blank, you need not consider the paragraph below.
13            Do you want to see that?
14            MR. NORTON:  I think I understand.  But sure.
15            Well, I agree with that as far as it goes.  But I
16    just reserve the objection that I stated earlier.
17            THE COURT:  That is fine.  And I understand your
18    view.  But I really do think that it is a -- either Mr. Hill
19    was in a position to be able to -- it is either he didn't know
20    and he couldn't withdraw or not.  And I understand the
21    distinction you're drawing.  But I think it is argument, and it
22    is not -- frankly, the more compelling thing is either he just
23    was sabotaged by his -- as you argued by his more experienced
24    peer who was really driving the thing or wasn't.
25            I think that is the likely -- that's the fact
```

1    situation that the jury is going to have to decide.  But I'll

2    add the note because I think -- I think it is an important one.

3    And I like -- I would like to also add his name just to

4    personalize it.

5               MR. MOULTRIE:  Your Honor, does the indictment look

6    okay?

7               THE COURT:  The indictment -- have you looked at the

8    indictment?

9               MR. NORTON:  Yes, ma'am.

10              THE COURT:  Do you have any objections?

11              MR. NORTON:  Well, Your Honor, honestly, I have not

12   been in this situation before where I have had a partial case

13   with a partial plea of guilty and going to trial on one count.

14   It seems like that you give the jury the charging document when

15   you go out, and that is normally the indictment.

16              In this case, the indictment includes charges that

17   are not at issue.  So why go to the jury when they are not an

18   issue?  There is no secret to the jury that he did plead guilty

19   to those things.

20              But it seems like -- consistent with what the theory

21   is behind giving the charging document to the jury, it would

22   just be the 924(c).

23              THE COURT:  Well, we've referenced it.  It is in the

24   evidence.  He has pled to it.  I think it is -- it is relevant.

25   And I'm happy to give them an instruction if you want.  But I

 1    think I already have.  But I can emphasize that they are only

 2    to focus on Count 3 once again.

 3              MR. NORTON:  That would be fine, Your Honor.

 4              MR. MOULTRIE:  Your Honor, what is your practice -- I

 5    can't recall -- when you provide the jury with the indictment?

 6    Is it before closing or after?

 7              THE COURT:  After.  After closing.

 8              MR. MOULTRIE:  Well, I have got the copies when

 9    you're ready.  Do you want them?

10              COURTROOM DEPUTY CLERK:  I have a copy.  But you can

11    give another one.

12              THE COURT:  I mean, I give it with --

13              COURTROOM DEPUTY CLERK:  With the exhibits.

14              THE COURT:  -- the exhibits.  So I'll take a look at

15    the language.  But if there is something you in particular want

16    when you look at the description of the indictment or the --

17    or Count 3.  If there is something in particular in terms of

18    the language you want, you need to --

19              MR. NORTON:  As far as instruction?

20              THE COURT:  Yes.

21              MR. NORTON:  No.  It would just be that the only

22    charge for you to decide is Count 3.  The other two he has pled

23    guilty to.

24              THE COURT:  Do you mind if I steal this for a moment

25    so I can give this to Ms. Cole?

 1            MR. MOULTRIE:  We trust you.

 2            THE COURT:  We'll take a break for a second, and I'll

 3    explain it to her and one other so that we can start producing

 4    things.

 5            And maybe you could get your next witness in here.

 6    Who is your witness?

 7            MR. GHOSE:  It is Jordan Peyton, the final witness,

 8    Your Honor.

 9            THE COURT:  I'm sorry?

10            MR. GHOSE:  Jordan Peyton.  He is a bank teller.

11            THE COURT:  All right.

12            COURTROOM SECURITY OFFICER:  All rise.  Court is in

13    recess.

14            **(A brief break was taken at 10:06 A.M.)**

15            THE COURT:  Please have a seat.  So right in that top

16    paragraph, you can see where it flowed from Page 8 because you

17    have the other one.  This is how I dealt with it.  See how --

18            We can talk about it later.  But you can take a look

19    at it now anyway.

20            All right.  Should we call the jury in?

21            MR. GHOSE:  Yes, Your Honor.

22            **(The jury entered the courtroom at 10:16 A.M.)**

23            THE COURT:  Good morning.  Sorry you had to wait for

24    us.

25            Mr. Ghose, who is your next witness?  We have him

1    here.  But go ahead and introduce him.

2         MR. GHOSE:  Yes, Your Honor.  The next witness is

3    Jordan Peyton.

4         COURTROOM DEPUTY CLERK:  Good morning, sir.  Please

5    raise your right hand.

6                     **(Witness sworn)**

7         COURTROOM DEPUTY CLERK:  Please pull up close to the

8    microphone so everyone can hear you.  Please just state your

9    name again for the record, and please spell your last name for

10   the record.

11        THE WITNESS:  My name is Jordan Peyton.  Last name is

12   P-E-Y-T-O-N.

13      Whereupon,

14                      JORDAN PEYTON,

15      after having been first duly sworn, testified as follows:

16                    DIRECT EXAMINATION

17   BY MR. GHOSE:

18   **Q.**   Morning, Mr. Peyton.

19   **A.**   Morning.

20   **Q.**   Could you tell the jury where you work.

21   **A.**   Currently, I work for a company called Paychex.

22   **Q.**   Were you previously with Wells Fargo?

23   **A.**   Correct.

24   **Q.**   What job did you have with Wells Fargo?

25   **A.**   I was a personal banker.

1   **Q.**   When did you leave Wells Fargo?

2   **A.**   I left in 2015.

3   **Q.**   All right.  Were you -- what time?  When in 2015?

4   **A.**   June.

5   **Q.**   Were you working at -- are you familiar with the Wells

6   Fargo branch that is at 979 Virginia Avenue in Atlanta?

7   **A.**   Correct.

8   **Q.**   Did you work at that branch?

9   **A.**   Yes.

10  **Q.**   Were you working at that branch on February 27, 2015?

11  **A.**   Yes.

12  **Q.**   Okay.  In the morning?

13  **A.**   Yes.

14  **Q.**   What position did you have on that day?

15  **A.**   I was a personal banker.

16  **Q.**   Can you describe kind of the layout of the bank and where

17  you were sitting on that day.

18  **A.**   So it is a really small branch.  It is a very open layout.

19  I was actually the first desk inside the branch.  So I was the

20  first point of contact when you walk in the branch.

21          MR. GHOSE:  Could you put up Exhibit 3, please.

22          AUSA ASSISTANT:  I'm sorry.  What was it?

23          MR. GHOSE:  Exhibit 3.  Let's try Exhibit 4.

24  **Q.   (BY MR. GHOSE)**   Okay.  Using the photograph that is on

25  your screen, can you just point out to the jury -- you can

 1  actually draw on that screen.  It is a touch screen -- where

 2  you were sitting?

 3  **A.**   (The witness complies.)

 4  **Q.**   Were you with a -- so were you there at around 9:30 that

 5  morning?

 6  **A.**   Yes.

 7  **Q.**   Were you with a customer or anything?

 8  **A.**   No.

 9  **Q.**   What happened at 9:30 on February 27, 2015?

10  **A.**   Well, I was sitting at my desk just doing something on my

11  computer.  And three men ran through the door.  The first --

12  the first guy was a bigger guy.  He ran in.  And he had -- as

13  he ran in, I saw the gun out.  He jumped the counter.

14       The second man came through the door.  And he kind of

15  manned the front door kind of where this picture is taken.

16       And the third guy came in.  He had his hand in his pocket,

17  and he -- he ran behind the teller line.

18            MR. GHOSE:  Okay.  Could we have Exhibit 20, please.

19  **Q.**   **(BY MR. GHOSE)**  All right.  So there's three men?

20  **A.**   Correct.

21  **Q.**   There's two men here in this photograph.  Which one came

22  in first?

23  **A.**   The bigger guy in the front with the white on his face.

24  **Q.**   Which guy came in second?

25  **A.**   The guy behind the intro sign.

1          MR. GHOSE:  Exhibit 21.

2     **Q.   (BY MR. GHOSE)**  And then who came in third?

3     **A.**   The guy with the gray hoodie.

4          MR. GHOSE:  Okay.  Could we have Exhibit 22, please.

5     I'm sorry.  22.  And then 23.

6     **Q.   (BY MR. GHOSE)**  All right.  So is this -- in Exhibit 23,

7     the person depicted in this exhibit, is this person you said --

8     did you say someone guarded the door?

9     **A.**   Yes.  Essentially manned the door.

10         MR. GHOSE:  Take it down, please.

11    **Q.   (BY MR. GHOSE)**  Okay.  All right.  So tell us -- so tell

12    us what each robber did respectively.

13    **A.**   Okay.  So the first guy, the bigger guy, ran in.  He had

14    the gun in his hand.  He jumped the counter immediately.  The

15    second guy came in.  He was the one who manned the door, and

16    the third guy ran behind the counter.

17         As I'm sitting at my desk, the second guy told me to stand

18    up and move away from my desk.

19    **Q.**   When you say the second guy, you're talking about the guy

20    at the door?

21    **A.**   The guy at the door, correct.  The second guy told me to

22    stand up and move away from my desk.  So I stood up, moved away

23    from my desk, and put my hands up the entire time.

24         There was another banker behind me as well.  And he told

25    him to do the same thing.

1   **Q.**   Did you comply?

2   **A.**   Yes.

3   **Q.**   All right.  Did you stay in that position with your hands

4   up for the duration?

5   **A.**   Correct.  Yes.

6   **Q.**   Did you continue to observe the bank robbery with your

7   hands up?

8   **A.**   Yes.  So where my desk is located, I can see the entire

9   teller line.  So I just stood there and just witnessed

10  everything that happened.

11  **Q.**   So tell us first with the guy guarding the front door, the

12  second robber, did you have any interaction with him?

13  **A.**   Only when he initially told me -- only when he initially

14  told me to move away from my desk.  So I moved away from my

15  desk.

16      The only other interaction that was kind of towards me was

17  the banker behind me -- I couldn't see what he was doing.  But

18  the bigger guy that was behind the counter told the guy at the

19  front to watch him.  So he took a couple of steps towards me

20  and said, what are you doing?  Move away from your desk.

21  **Q.**   Did either the big guy or the guy at the door make any

22  threats to any of the bankers?

23  **A.**   Not the bankers.  But the big guy made a threat towards

24  the teller.

25  **Q.**   What threat did he make?

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    **A.**    Told him to hurry up.  He said if he doesn't hurry up

2    somebody is going to die today.  He also did a countdown from

3    like five down.

4    **Q.**    So you could hear that --

5    **A.**    Correct.

6    **Q.**    -- even though you were on the other side of the bank?

7    **A.**    Yeah.  The branch is really small.  So I can hear most of

8    the stuff that happens in there.

9    **Q.**    Can you describe for the jury since the video has no audio

10   how loudly the --

11   **A.**    So the guy was --

12   **Q.**    -- how loudly the big robber said what he said?

13   **A.**    He said it really loud.  You know, aggressive tone.  He

14   said it really loud and for everyone to hear.

15   **Q.**    Did he -- specifically, did the guy at the door say

16   anything that you can remember?

17   **A.**    He did.  At one point, he said time, time, time.

18   **Q.**    What about the small robber?  Did he say anything?

19   **A.**    I couldn't hear him very well.  If he said anything at

20   all, he was probably the most calm -- the quietest one out of

21   all of them.

22   **Q.**    At what point were guns drawn during the bank robbery?

23   **A.**    So I saw guns as soon as they ran through the door.  So

24   the first -- the first -- the bigger guy had the gun out as he

25   ran through the door.  He might have pulled it out as he was

1   running through the door.  But as he is jumping over the

2   counter, I see the gun out.  The guy that manned the door had

3   his gun in his hand the entire time.  So I could see it as he

4   was standing at the door.

5   Q.   Did both the big robber and the robber at the door have

6   their guns drawn when the smallest robber came into the bank?

7   A.   Yes.

8   Q.   When the smallest robber came into the bank, did he

9   hesitate?

10  A.   No, not that I could tell.

11  Q.   Did he stop and turn around?

12  A.   No.  He continued directly to his path behind the teller

13  line.

14  Q.   Did the smallest robber say anything to the other robbers?

15  A.   No, not that I could tell.

16  Q.   Did he have any reaction at all to the drawn guns?

17  A.   No.  He just -- like I said, he continued on his path to

18  behind the teller line.  He was pretty calm throughout the

19  process.

20          MR. GHOSE:  That's all I have, Your Honor.

21          THE COURT:  Thank you.

22              **(There was a brief pause in the proceedings.)**

23                      CROSS-EXAMINATION

24  BY MR. NORTON:

25  Q.   Mr. Peyton, there is a sign that we're looking at that

1   says Wells Fargo -- I can't really tell the rest of it.  On the

2   backside, it says something about an intro rate.

3        Is that where that sign was located on that day in

4   question, February 27?

5   **A.**   The online banking sign was.  I know that for a fact

6   because it has always been there.

7        Are you talking about the smaller sign right in front of

8   it?

9   **Q.**   Well, no.  From the other pictures -- and depth can be a

10  little deceiving.  So that is why I'm asking.  It looked like a

11  tallish sign was fairly close to the door, so you would walk

12  in, and you would immediately encounter a fairly tall sign?

13  **A.**   Where the black mat is?

14  **Q.**   Well, closer than where it appears to be in this picture.

15  Is it correct -- what I'm asking you is:  On the day in

16  question, February 27, if we're standing here at the doorway,

17  wouldn't there be a tall sign, maybe not the one that we see

18  further into the room -- but a fairly tall sign either on that

19  dark mat right in front or at least much closer to the door?

20  **A.**   There was a sign, yes.

21  **Q.**   But it is not in this picture?

22  **A.**   No.

23  **Q.**   Okay.  So the bank didn't look exactly like this on the

24  day in question?

25  **A.**   The only thing that was different is there was a sign

1    there.

2    **Q.**   Okay.  How far away from the door would you say that that

3    sign was?

4    **A.**   I would say 5 feet or so.

5    **Q.**   5 feet.  So -- let's do it this way.  I'll walk towards

6    you.  You tell me when you think that I'm as close as that sign

7    would be to somebody.  You're standing at the door.  I'm the

8    sign -- moving sign.  Okay.

9    **A.**   About right there.  Maybe a couple of steps back.

10   **Q.**   This distance?

11   **A.**   Yes.

12   **Q.**   So if you're standing at the door and I'm the sign, where

13   you would be sitting would be approximately where the court

14   reporter is sitting?

15   **A.**   Yes.

16   **Q.**   Okay.  The guy that came in the door, you said he had his

17   gun drawn.  Did you see when he drew his gun?

18   **A.**   The first person that came through the door?

19   **Q.**   I'm sorry.  I made that confusing.  Let's start with the

20   first guy.  So the first guy comes in.  You said that he -- he

21   had -- he took his gun out as he was coming in the door; right?

22   **A.**   Correct.

23   **Q.**   And at that point then, the smallest guy wasn't even in

24   the vestibule yet?

25   **A.**   He wasn't in the building yet or at least in my point of

1    sight yet.

2    **Q.**   Okay.  So the big guy did not have his gun drawn until he

3    got to the door; correct?

4    **A.**   As he -- to the first door -- as he is coming through the

5    door, I'm seeing him pulling out his gun.

6    **Q.**   You actually saw him pull it out?  You didn't think, oh,

7    he pulled it because you saw it out?  You actually saw him pull

8    it out of his clothing?

9    **A.**   Correct.

10   **Q.**   And it was not visible until he did do that?

11   **A.**   Yeah.  He pulled it out of his jacket as he is coming

12   through the door.  And as he is running through the lobby area,

13   he had it out.

14   **Q.**   Right.  So if you saw him actually pull it out of his

15   clothing, where was he as best you can recall at the moment

16   that they -- well, he was on the move; right?  He was moving

17   fast?

18   **A.**   Yeah.

19   **Q.**   Okay.  So can you say where exactly he was at the time

20   that he was pulling the gun out?

21   **A.**   At the glass doors -- at the two glass doors.  As he is

22   coming through the glass doors -- the glass doors open.  As the

23   glass doors are opening, that is when I see the gun.

24   **Q.**   Got it.  When you say the glass doors, you mean the inside

25   set of glass doors?

1    **A.**   Correct.  I can't see the outside.

2    **Q.**   Otherwise, you wouldn't have been able to see him at all.

3    **A.**   Yeah.  The ones inside the branch.

4    **Q.**   So now I'm going to talk about the second guy that came

5    in.

6         Okay.  Now, he's the one that stayed by the door?

7    **A.**   Correct.

8    **Q.**   Did you actually see him pull the gun out of his clothing?

9    **A.**   No.  As he came through, I saw -- I saw the gun.  I didn't

10   see him pull his out.

11   **Q.**   And then you saw the third guy come in after that; right?

12   **A.**   Correct.

13   **Q.**   Is there a little bit of delay between the second guy and

14   the third guy?

15   **A.**   A little bit.

16   **Q.**   When the second guy, the guy that ended up standing at the

17   door -- when he -- after he pulled the gun out, for the first

18   few seconds of this episode at least, he had the gun held down

19   kind of tight by his side, didn't he?

20   **A.**   It was by his side.  I wouldn't say it was tight.  But it

21   was by his side.

22   **Q.**   Okay.

23        MR. NORTON:  Just a second, please.

24             **(There was a brief pause in the proceedings.)**

25        MR. NORTON:  Actually, let me do this.  Could I have

UNITED STATES DISTRICT COURT
OFFICIAL CERTIFIED TRANSCRIPT

1    Exhibit 22.

2    **Q.   (BY MR. NORTON)**  I just want to make sure I'm with you on

3    this.  So I was asking about a sign.  Do you see that sign at

4    the bottom right on Exhibit 22?

5    **A.**   Right.

6    **Q.**   This sign says an intro rate?

7    **A.**   Correct.

8    **Q.**   That is what -- the other picture we looked at, Exhibit 4,

9    shows -- doesn't show that sign, at least not located in that

10   position?

11   **A.**   Uh-huh (affirmative).

12   **Q.**   So here Exhibit 22 as it appears is much closer to the

13   door --

14   **A.**   Uh-huh (affirmative).

15   **Q.**   -- than what Exhibit 4 indicates?

16   **A.**   Yeah.  The picture before?

17   **Q.**   Yes.  Exhibit 4 is the one we looked at where they are

18   looking into the room from the door.

19   **A.**   Uh-huh (affirmative).

20         THE COURT:  Can you answer yes or no just simply for

21   the record?

22         THE WITNESS:  Yes.

23   **Q.   (BY MR. NORTON)**  Okay.  There is a chair over there to the

24   bottom right just above the Government's exhibit sticker?

25   **A.**   Yes.  That is my desk.  The chair is for where the

1    customers sit.

2    **Q.**    So that is a side chair for your desk?

3    **A.**    Correct.

4    **Q.**    Is the side --

5    **A.**    It is in front.  It is in front of me.

6    **Q.**    Actually, if you're sitting at the desk -- let's say this

7    podium is the desk and you're sitting here.  That would be the

8    chair over there?

9    **A.**    Correct.

10   **Q.**    And your -- the depth of your desk would be maybe about

11   like this?

12   **A.**    I would say so.

13   **Q.**    Something like that?

14   **A.**    Maybe a little bigger.  Around that.

15   **Q.**    Maybe a little bigger than the depth of this podium?

16   **A.**    Just a little bit.  It is about that size.  Not much

17   bigger.

18   **Q.**    I'm not trying to be precise.  But if your desk is the

19   size of this podium and you're sitting back here, that chair

20   would be right over there?

21   **A.**    Correct.

22   **Q.**    That's the chair we're looking at in the bottom right of

23   Exhibit Number 22.

24       Let me ask this:  Kind of right above and behind that

25   chair that is across from your desk, do you see a little piece?

```
 1              THE COURT:  I just want to make sure the jury can

 2    hear you while you're looking at the picture.  Thank you.

 3    Q.   (BY MR. NORTON)  Looking again at this Government's

 4    Exhibit 22, right above where the exhibit sticker is, there is

 5    the chair?

 6    A.   Uh-huh (affirmative).

 7    Q.   That is what you describe as being a chair that is right

 8    across from the desk you sit at?

 9    A.   Correct.

10    Q.   Right above that, kind of behind that chair, is a little

11    piece of what looks like a cubicle maybe?

12    A.   Correct.

13    Q.   That is what it is?

14    A.   Yes.  Basically.  It is an open cubicle.

15    Q.   Open meaning there is a couple of sides to it?

16    A.   Yes.  It is nothing closed off.  It is like a small little

17    closed off behind me.  But it is not anything that blocks in

18    the front and completely behind me.

19    Q.   You are still completely open to the middle of the room?

20    A.   Correct.

21    Q.   This is just to give a little visual wire divider from

22    where your office area -- your desk area would be?

23    A.   Correct.

24    Q.   So tell me if I'm perceiving this correctly from this

25    angle.  There is a right angle on this cubicle, and it looks
```

1   like the corner of it is next to the wall?

2   **A.**   Correct.

3   **Q.**   So actually the side of the cubicle is not flat to the

4   wall?  It is at an angle so that it kind of comes out from the

5   wall?

6   **A.**   Yeah.  There is -- the wall, too, is angled as well.  So

7   it is kind of hard to describe.  But the side of the cubicle is

8   basically parallel to the window.

9   **Q.**   Okay.  So I wanted to make sure I'm seeing what I think

10   I'm seeing here.  The chair that is across from your desk that

11   is here in the bottom right of Government's Exhibit Number 22

12   is a couple of feet at least away from the wall; right?

13   **A.**   I would say so, yes.  Couple of feet.

14   **Q.**   Okay.  And also tell me if I'm perceiving this right

15   because I'm just looking at pictures and you work there.  That

16   wall, the beige yellowish-looking wall there that has got -- it

17   looks like a fire alarm over there and so on.

18       If you were to run your hand along that wall, the frame

19   for the door is inset a few inches?  Does that make sense?  In

20   other words, when you are coming through the door, the door --

21   the door is not -- the doorway -- the actual door is not

22   completely flush with that wall?  It is actually set back a few

23   inches from the wall?

24   **A.**   Yes.  I don't really -- can you just explain a little bit

25   better?

1   Q.   Well, what I'm getting to is:  This chair that we've been

2   talking about that is right across from your desk, if you -- if

3   you were to take a tape -- if you were to pull the chair over,

4   you know, directly parallel along the wall to right in front of

5   the door and then run a tape measure over to the door, it would

6   be -- we don't know the precise distance.  But it wouldn't be

7   right up next to the door?  It would be two or three, maybe

8   more feet?

9   A.   Yes.

10  Q.   Okay.

11          MR. NORTON:  Thank you.

12          MR. GHOSE:  Just a few questions on redirect.

13          Could we have Exhibit 22, please.

14                    REDIRECT EXAMINATION

15  BY MR. GHOSE:

16  Q.   So I just want to establish -- reestablish at this moment

17  with Exhibit 22 -- I want to try to establish what the robber

18  with the blue gloves would have been facing.  Okay.

19       So Exhibit 22 at this moment.  Now let's look at

20  Exhibit 13.  Based on what you recall, is this what he would

21  have been facing?

22  A.   Correct.  The teller line, yes.

23  Q.   Go back to Exhibit 22.  So as the smallest robber turns

24  into the bank and starts walking toward the teller counter,

25  Exhibit 13, this is what he sees?

1    **A.**    Correct.

2              MR. GHOSE:  No further questions.

3              MR. NORTON:  Nothing further.

4              THE COURT:  Do you have any additional witnesses?

5              MR. GHOSE:  No further witnesses.

6              THE COURT:  Do we have all of your exhibits?  Have I

7    ruled on all of your exhibits?

8              MR. GHOSE:  I believe so.

9              THE COURT:  May this witness be excused, gentlemen?

10             MR. NORTON:  Yes, Your Honor.

11             MR. GHOSE:  Yes, sir.

12             THE COURT:  Thank you very much, sir.

13             THE WITNESS:  Thank you.

14             MR. GHOSE:  There's still some outstanding exhibits.

15   If we could have a brief recess and consult with Your Honor.

16             THE COURT:  We're going to sort of see where we're

17   going here.  Would you excuse yourselves for a few minutes.

18   Thank you.

19                    **(The jury exited the courtroom at 10:37 A.M.)**

20             MR. GHOSE:  Regarding exhibits, Your Honor, the only

21   ones that are outstanding, ones that have been offered but not

22   ruled upon, are the Exhibits 80 through 85.  Those are all

23   still -- still images from the Avalon Ridge surveillance

24   videos.

25             Some of that evidence was admitted during Kayode

1    Adeleye's direct examination.  But the remainder, 80 through

2    85, which I offered and which Your Honor withheld judgment on

3    or withheld ruling on, are still outstanding.

4         So I guess we would move at this point to admit them

5    for the same reasons that Exhibit 77 through 79 were admitted.

6         THE COURT:  Can I see them again?

7         MR. GHOSE:  Yes, Your Honor.

8         THE COURT:  I'm sorry.  They are here.  I'll get

9    them.  80 to 85.  Excuse me.

10         And I allowed in the ones he identified?  79 and --

11    any others?

12         MR. GHOSE:  Yes.  Those are the ones that

13    Mr. Moultrie discussed with Kayode Adeleye, and those were

14    admitted.

15         THE COURT:  Did somebody else identify the others?

16         MR. GHOSE:  Yes.  Edward Smart on the first day of

17    trial was the security video custodian basically, and he

18    authenticated them.

19         THE COURT:  What was the -- I realize there was a

20    relevance objection.

21         MR. GHOSE:  It was a little out of order.  We were

22    just trying to get the witness in for that day.

23         THE COURT:  What is the point of 84?

24         MR. GHOSE:  Well, 84 is similar to the other ones,

25    which is that it is evidence of what Hill and the other robbers

 1   did after the bank robbery to show their coordination.  So it

 2   is --

 3          THE COURT:  If you look at 84, it doesn't seem to

 4   show me anything, really.

 5          MR. GHOSE:  Well, 84 is from that evening -- that

 6   evening when they went to retrieve the abandoned rental car,

 7   the Xterra.

 8          I'm not sure, Your Honor.  Actually, I think we

 9   should withdraw 84 because I don't think Mr. Adeleye addressed

10   what happened that evening.

11          THE COURT:  Yeah.  I have the same problem as to 85.

12   That is also at night.

13          MR. GHOSE:  Yes.  I would withdraw 84 and 85.  But

14   83, 82, 81, and 80 are all relevant because they talk about the

15   moments when they abandoned the white Mercedes and got into the

16   minivan.

17          MR. NORTON:  Same objections as before.

18          THE COURT:  I think they can come in.  But not 84 and

19   85.

20          MR. GHOSE:  That is fine, Your Honor.  And everything

21   else, Your Honor, is in.

22          THE COURT:  All right.  Are you closing your case at

23   this time?  Are you resting at this time?

24          MR. GHOSE:  Yes.  The Government rests, Your Honor.

25          MR. NORTON:  Well, I have a motion.  I think I have

```
 1    to make it when the jury -- I think there is some weird law

 2    that suggests --

 3             THE COURT:  About making it while the jury is

 4    present?

 5             MR. NORTON:  Right.  If the Court likes, I can state

 6    the reasons now and then when the jury comes back just renew

 7    the motion so they don't have to keep coming back and forth

 8    with the jury.

 9             THE COURT:  Why don't you state -- I don't know about

10    it.  But there are lots of things I don't know about, as it

11    turns out, as I see every day.  So I wouldn't want you to in

12    any way commit error.

13             So if you think that you need to, make it in front of

14    the jury -- just the motion.  But why don't you state the

15    reasons now, and I'll just --

16             MR. NORTON:  So this would be the argument the Court

17    has already heard when I make the motion.

18             THE COURT:  Just come forward.

19             MR. NORTON:  It is a sufficiency of evidence motion

20    because -- I'm not going to argue all of the evidence the Court

21    has certainly heard.

22             But, really, what this comes down to is we're hearing

23    a lot about -- an awful lot about the events inside of the

24    bank.  We're hearing about events after the robbery and then a

25    very little bit about the events before.
```

1            And what our contention is is that, you know, if you

2   break it up into those three time frames, the last bit --

3   everything after they leave the bank is really irrelevant.  I

4   understand the -- I mean, I see there is a tiny bit of

5   relevance because they recovered the guns.

6            But to say that everything that happened after when

7   they know they are made constitutes evidence of a plan, it

8   seems like it is the exact opposite.  So, you know, that is why

9   I have been a little tentative about saying it is irrelevant

10  because there's the guns recovered -- two guns recovered.  But

11  that is about the extent of the relevance that I can think of.

12  And that can be disposed of in a sentence or two.

13           So although that is -- all of the time frame after

14  that is almost entirely irrelevant, it is certainly prejudicial

15  because we're retrying the bank robbery again.

16           Then the time during the bank, yes, it is relevant

17  because you can draw inferences from what happens in the bank.

18  But those inferences only go so far.

19           I'm not going to say there is no evidence.  I'm

20  saying there is insufficient evidence.  And the really relevant

21  time frame is everything that happened before they go into the

22  bank.

23           Now, I understand we heard from Mr. Adeleye.  But if

24  you look at the circumstances and look at all the people

25  involved, look at what we haven't heard, I maintain that that

```
 1    is -- should be deemed insufficient as a matter of law to

 2    sustain the -- to support a conclusion -- a fact conclusion

 3    that Mr. Hill had advance knowledge such that it was -- he is

 4    in it too far and it is too late to reasonably be able to walk

 5    away.  So that is the basis for our motion.

 6              THE COURT:  Thank you.

 7              MR. MOULTRIE:  Your Honor, could I have a moment to

 8    ask Mr. Norton a question?

 9              THE COURT:  Yes.

10              (There was a brief pause in the proceedings.)

11              MR. MOULTRIE:  Your Honor, it wouldn't be appropriate

12    to make the Rule 29 motion in front of the jury.  That happens

13    now.  I just wanted to make that point.

14              Your Honor --

15              THE COURT:  Right.  I'm just -- I just heard him say

16    he felt he needed to do it.

17              MR. MOULTRIE:  All right.

18              THE COURT:  I thought Mr. Norton maintained he needed

19    to do it in front of the jury.  Not make the argument but make

20    the motion.

21              MR. NORTON:  I feel like I need to make the motion in

22    front of the jury.

23              MR. MOULTRIE:  That is just to say that I move but

24    not state the reasons?

25              THE COURT:  That's right.
```

1           MR. NORTON:  I was going to say I move to dismiss

2      and --

3           THE COURT:  Why don't you just make the motion by

4      reference to the rule and --

5           MR. NORTON:  I make a motion pursuant to Rule 29.

6           THE COURT:  And then I'll say I deny it or I'll grant

7      it for the reasons --

8           MR. NORTON:  Very well.

9           THE COURT:  All right.

10          MR. MOULTRIE:  Thank you, Judge.  Your Honor, the

11     Court has heard the evidence.  The jury not only had the

12     benefit of the factual stipulation covering all the facts to

13     which Mr. Hill agreed in terms of the planning of the armed

14     bank robbery generally, including the fact that real firearms

15     would be used during the course of the armed bank robbery, but

16     they also heard direct testimony from one of the participants,

17     Mr. Adeleye, who spoke directly to the issue of advance

18     knowledge and testified before the jury that he received the

19     gun used for the armed bank robbery directly from Mr. Hill not

20     only on the date of the armed bank robbery but on the day prior

21     to the date of the armed bank robbery.

22          There is sufficient evidence for the charge to go

23     before the jury based on the one defense that Mr. Hill is

24     advocating.  And that is, that he lacked the requisite advance

25     knowledge a firearm would be specifically brandished during the

1    firearm (sic).

2         Of course, the Court has also seen the video footage

3    that shows Mr. Hill entering the bank when the guns are

4    brandished and also continuing with the bank robbery after the

5    firearms were brandished.  We ask that you deny the Rule 29

6    motion.

7         THE COURT:  I'm going to deny the motion because I

8    think a reasonable jury could find either way.  I think a

9    reasonable jury could find based on the evidence presented that

10   Mr. Hill either knew or was in a position to withdraw once he

11   saw the gun based on evidence presented.

12        But there is also reasonable evidence in the record

13   upon which a jury could determine the opposite.  And it is

14   really a jury question that I can't resolve myself.  And there

15   is a sufficient foundation of evidence for it to go to the

16   jury.

17        Are you going to call any witnesses?

18        MR. NORTON:  Your Honor, it is suggested that this

19   would be the opportune time if the Court desires to address

20   Mr. Hill about his rights.

21        THE COURT:  All right.

22        Mr. Hill, you know at trial -- and we went through

23   this some at your original plea proceeding on Counts 1 and 2 --

24   you do have the right to testify and present your evidence in

25   this proceeding and your version of the events.  But you also

1   have the right to remain completely silent.  You cannot be

2   forced to testify or produce any evidence or present any

3   witnesses.

4           And if you choose not to testify here, the fact that

5   you did not testify cannot be considered against you by the

6   jury in determining whether you are guilty of the offense

7   charged.  But you do have the absolute right to testify if you

8   so choose.

9           Do you understand that?

10          THE DEFENDANT:  Yes, ma'am.

11          THE COURT:  All right.  Do you wish to discuss with

12  your client at all further whether he wishes to proceed?

13          I can go check on my verdict form meanwhile if you

14  want a few minutes.

15          MR. NORTON:  I think it will just take a second.

16          THE COURT:  All right.

17          **(A discussion ensued off the record between the**

18              **defendant and defense counsel.)**

19          MR. NORTON:  I think we're resolved on that, Your

20  Honor.

21          THE COURT:  Does he wish to proceed or not?

22          MR. NORTON:  We do not wish to proceed.  We have no

23  evidence.

24          THE COURT:  Mr. Hill, you understand that?

25          THE DEFENDANT:  Yes, ma'am.

384

1              THE COURT:  Do you have any witness -- other

2    witnesses to call?

3              MR. NORTON:  No, Your Honor.

4              THE COURT:  Okay.  Well, then I'm going to go check

5    on my verdict form and modify the instruction accordingly so it

6    can be produced.

7              Do you need any time before we begin opening

8    arguments?

9              MR. GHOSE:  No.

10             MR. NORTON:  No.

11             THE COURT:  So we'll begin opening arguments --

12   closing arguments.  Excuse me.  You wanted 40 minutes.  Do you

13   still want 40 minutes?

14             MR. GHOSE:  30 minutes for the first close and 10

15   minutes for rebuttal.

16             THE COURT:  All right.  And we'll take a break

17   between the two closing arguments.

18             All right.  Is there any evidence that you wanted to

19   submit that you have not had an opportunity to submit that you

20   thought you had tendered or otherwise, Mr. Norton?

21             MR. NORTON:  For the defense, no, Your Honor.

22             THE COURT:  Okay.  All right.  Does the defense rest?

23   I just want to make sure that you're not -- you're not trying

24   to in any way introduce anything further?  I just want to make

25   sure that the evidence is closed.

```
1            MR. NORTON:  That is correct.  I think I have to rest
2    when the jury comes back.
3            THE COURT:  All right.  Very good.  All right.  So I
4    think this will just take me a few minutes, and we'll get the
5    jury back.
6            COURTROOM SECURITY OFFICER:  All rise.  Court is in
7    recess.
8            (A brief break was taken at 10:54 A.M.)
9            THE COURT:  Please have a seat.  I understand,
10   Mr. Ghose, you want to change Number 2 to say, we, the jury,
11   further find with respect to that count --
12           MR. GHOSE:  That a firearm.
13           THE COURT:  -- that a firearm.
14           MR. GHOSE:  That is my only suggested change, Your
15   Honor.
16           THE COURT:  Do you have any objections to that?
17           MR. NORTON:  I'm sorry?
18           THE COURT:  Mr. Norton, do you have any objections to
19   the change?  I'll let you do the objections to the entire
20   verdict form.  But do you have any objections to the
21   substitution of the article a for the?
22           MR. NORTON:  No objection to that.
23           THE COURT:  All right.  Do you want to make any
24   objections to the verdict form again just to renew them?
25           MR. NORTON:  Just to renew what I have already
```

 1   stated.

 2           THE COURT:  All right.  All right.  Do we want to

 3   wait for the -- don't we need to wait for Mr. Moultrie for the

 4   closing?

 5           MR. GHOSE:  He actually said not to wait but --

 6           THE COURT:  For the closing?  You want him to be

 7   walking in?

 8           MR. GHOSE:  I don't know where he went.  He said

 9   don't wait for me.  But he left.  So --

10           THE COURT:  All right.

11           MR. GHOSE:  But I would prefer to have him here.  I'm

12   sure he will be here momentarily.

13           THE COURT:  Why don't I -- I hate to leave him out

14   and have him come in in the middle.

15           MR. GHOSE:  Let me call him real quick.

16           THE COURT:  Why don't we see where he is.  But I also

17   would like to begin.

18           MR. GHOSE:  Right.

19           THE COURT:  So you take a look.  I'll bring this back

20   to Holly.

21           COURTROOM SECURITY OFFICER:  All rise.  Court is in

22   recess.

23           **(A brief break was taken at 11:08 A.M.)**

24           THE COURT:  All right.  We'll go ahead and get the

25   jury back.

 1            **(The jury entered the courtroom at 11:11 A.M.)**

 2            THE COURT:  Mr. Norton -- does the Government rest?

 3            MR. GHOSE:  Yes, Your Honor, the Government rests.

 4            MR. NORTON:  Your Honor, we have a motion pursuant to

 5   Rule 29 for the reasons we have previously stated.

 6            THE COURT:  For the reasons I have stated, the motion

 7   is denied at this time.

 8            MR. NORTON:  The defense rests.

 9            THE COURT:  All right.  The defense rests and doesn't

10   wish to present any further testimony or evidence?

11            MR. NORTON:  Correct, Your Honor.

12            THE COURT:  All right.  Very good.

13            Ladies and gentlemen, then we are ready to hear

14   closing argument in the case.  And I have given the parties 40

15   minutes apiece.  Because the Government bears the burden of

16   proof to establish its case, it goes first.  And it may reserve

17   some amount of time to respond to the closing argument provided

18   by defense counsel.  And my understanding is that that is what

19   is going to occur here.

20            So, Mr. Ghose, are you proceeding or Mr. Moultrie?

21            MR. GHOSE:  I am, Your Honor.

22            THE COURT:  All right.  Very good.  What we're going

23   to do, though, just simply so that you can pay maximum

24   attention to counsel is, after the Government completes its

25   closing argument, we're going to take a very short break so you

1    can stand and use the restroom if you need to.  And then we'll

2    resume, and we'll hear from defense counsel.  So I just want --

3    so we are really just having the shortest of breaks.  And if no

4    one needs one at that time, we'll determine that at that point

5    depending on really how long Mr. Ghose actually takes.

6           And at the -- but the point is so that you can really

7    focus on all of the words being thrown your way.  It is a lot

8    of words.  And at the conclusion of all of that, then I'm going

9    to give you the instructions on the law.  And I think that will

10   bring us approximately to 1:00.  And then if we can do it by

11   then, great.  I have something I have to be speaking at at

12   1:00.  If not, then I'll give you the instruction of the law

13   after lunch.  And then you'll begin deliberations.

14           MR. GHOSE:  Yes, Your Honor.  Thank you.

15                       CLOSING ARGUMENT

16           MR. GHOSE:  Good morning, ladies and gentlemen.

17           JURY PANEL:  Good morning.

18           MR. GHOSE:  As you have heard, the defendant, Ryan

19   Hill, has been charged with three counts in this case,

20   Counts 1, Counts 2, and Counts 3.  But the only count before

21   you is Count 2 (sic).  That is because, as you have heard, the

22   defendant has already pled guilty to Count 1 and Count 2.

23           Count 1 charged conspiracy to commit the bank robbery

24   at the Virginia-Highland Wells Fargo on February 27, 2015.  He

25   has pled guilty to that count, and you have heard the factual

1    basis that was read into the record.

2         Count 2 charged armed bank robbery.  Now, an armed

3    bank robbery can be done with any kind of weapon.  And the

4    defendant has pled guilty to that count as well.  You have

5    heard the factual basis for that as well.

6         What is left for you to decide is Count 3.  Count 3

7    charges a separate offense that relates to the use of a firearm

8    specifically during and in relation to a crime of violence.

9    And in this case it is the armed bank robbery the defendant has

10   already pled guilty to.  So your decision -- the facts that you

11   have to decide is whether or not the defendant, Ryan Hill, is

12   guilty of Count 3.

13        Count 3, I think Mr. Norton referred to it as a

14   924(c) offense at the beginning of this case.  That is not that

15   helpful to you.  What will be helpful to you is to know what it

16   is about.  What it is about is the use of a firearm during that

17   crime of violence.

18        You have heard during this case as you heard in the

19   opening and now you will hear from me now that the

20   Government does not contend that the defendant had a gun during

21   this bank robbery.  You saw the video during the trial.  You

22   saw his hands.  He had no gun.

23        Some of the bank tellers have said that their memory

24   from this ordeal is that he did have one.  But that is not our

25   contention.  But that does not preclude his guilt.  Ryan Hill

1    can -- under the law, Ryan Hill can still be guilty of Count 3

2    even if he didn't have a gun.

3            The reason for that is aiding and abetting.  Okay.

4    So what is aiding and abetting?  Judge Totenberg has already

5    instructed you actually on this.  She'll instruct you again.

6    But it bears repeating because that is what you have to decide.

7            Did Ryan Hill aid and abet Kayode Adeleye and Bruce

8    Brown when they carried guns into the robbery of the Wells

9    Fargo?

10           What is aiding and abetting?  There's a couple of

11   different instructions that you will be given in this regard.

12   Aiding and abetting in general is when someone intentionally

13   joins with someone else to commit a crime.  They join together.

14   They are held liable together.

15           But for Count 3, which charges a specific type of

16   crime, there is more that you have to consider.  Active

17   participation.  Judge Totenberg will instruct you that in order

18   to be guilty for aiding and abetting, Count 3, Ryan Hill must

19   have actively participated in the bank robbery.

20           I would submit to you that this is an easy decision

21   to make.  He has already pled guilty to the armed bank robbery,

22   and there is no dispute that he actively participated in the

23   bank robbery.  You saw what he did.  He admits that is him.  He

24   wore the blue gloves.  He took away the money.  He actively

25   participated in the bank robbery.  So that is not a significant

1    issue.

2             What is a more significant issue, as you heard

3    Mr. Norton refer to in the beginning and Mr. Moultrie as well:

4    Did Ryan Hill have advance knowledge that guns would be used

5    during this bank robbery?  That is what this case is about.

6    That is what you have to decide.

7             That is why so much time is spent in this relatively

8    short amount of trial about what exactly would Ryan Hill had to

9    have known when he entered that bank.  Did he know whether or

10   not guns were going to be used during that bank robbery?

11            So there's two parts to this.  Okay.  You are going

12   to hear the meaning of advance knowledge.  But that instruction

13   you'll hear -- when you hear the instruction from Judge

14   Totenberg, advance knowledge can mean knowledge a week before,

15   it can mean a day before, it can mean an hour before, it can

16   mean a second before, it can even mean just after the bank

17   robbery started if it is at a moment where the defendant can

18   still walk away from it.

19            Okay.  If he learns of that gun at a moment when he

20   can still walk away from that offense, that is advance

21   knowledge.  If he learns of that gun at the very end of the

22   offense or after it is over, that is not advance knowledge.

23            So I suspect that Mr. Norton is going to argue that

24   Ryan Hill had nothing -- he didn't know that there were guns

25   involved until either after the bank robbery was over or right

1    until it was at the end and it was too late to walk away.

2              So your decision is did -- the decision you have to

3    make is did he know before whether or not guns were going to be

4    involved, knowing that advance knowledge could mean a week, a

5    day, an hour, a second.

6              Okay.  So what is advance -- let's -- and did Ryan

7    Hill have that advance knowledge?

8              Could I have Exhibit 23, please.  Actually, sorry.

9    Exhibit 22.  Yeah.  23.  Let's do 23 first.  Exhibit 23.  Now

10   Exhibit 21.  Okay.  Now back to Exhibit 23.

11             Look at Bruce Brown's gun.  Has Ryan Hill entered

12   that bank yet?

13             Exhibit 21, please.

14             Where is that gun?  That gun -- he has got the gun

15   out.  He puts it by his side, and Ryan Hill is walking in.

16   That gun is visible to Ryan Hill.  Could he walk away at that

17   moment if he didn't want to be a part of an armed bank robbery

18   and use of a firearm during a crime of violence?  Absolutely,

19   he could have walked away.

20             Did he -- did he flinch?  Did he look surprised?  Did

21   he pause?  Did he say anything to his fellow robbers like, what

22   the heck are you doing?  This is not how this was supposed to

23   go.  Of course not.  Because this is part of the plan.  He knew

24   that gun was going to be involved.

25             Let's look at Exhibit 22, please.

```
 1              This is Ryan Hill walking in moments later, probably
 2   less than a second later.  Where is Kayode Adeleye at this
 3   moment?  He came in first.
 4              Exhibit 13, please.
 5              That is where he is.
 6              Exhibit 6, please.  Sorry.  Exhibit 3.
 7              Look at the size of this bank.  Okay.  This is the
 8   view that Ryan Hill had when he walked into the bank.
 9              Exhibit 13.
10              And that is what he saw.  That is what he saw when he
11   walked in.  Did he have advance knowledge the moments before he
12   started to participate in that bank robbery?  Of course, he did
13   because the guns were out.
14              What else was out?  Everyone's hands are up.  This is
15   Exhibit 8.  I won't play it for you because I don't want to
16   waste time.  Exhibit 8 is the camera behind Vada Faniel's
17   teller station.  What did you see when we played that video?
18              All three of them, Vada, his customer, and his other
19   customer.  Is this what you do when people walk in without
20   guns?  No.  You do this instinctively because guns are drawn on
21   you.  That is what Ryan Hill saw when he walked in.  Hands up;
22   guns out.
23              He was an active participant.  He was a knowing
24   participant with advance knowledge.  He should be held -- and
25   under the law, he should be held responsible for this offense.
```

1          But that is not all that you know about.  It is also

2   what you heard.  What did Kayode Adeleye say?  What did he say

3   during this robbery?  What did each and every teller say to

4   some effect about what he said?  Someone is going to die today.

5          Is that -- do you kill people when you walk in a bank

6   without guns?  When you are doing a strongarm robbery, you

7   wrestle them to death?  No.  You have guns.  That is how

8   someone is going to die today.  That is what Ryan Hill heard.

9   Hands up; guns drawn.  Someone is going to die today.  And he

10  walked in there as Jordan Peyton said calm, collected because

11  everything was going according to their plan.  That was the

12  plan.

13         Of course, that was the plan.  Think about Willie

14  Harper, the first witness that we put up.  You have to go back

15  three days to Monday.  Mr. Norton said there is a note job,

16  there is a takeover, and then there is this third category, the

17  strongarm takeover.  The robbery where people go in dressed

18  like armed robbers but don't actually use guns.

19         What did Willie Harper tell you about that?  No such

20  thing exists.  People don't go in dressed like that --

21         You can take that down, actually.

22         They don't go in dressed like that to wrestle people

23  to the ground.  They go in with guns.  How do you take over a

24  bank without guns?  How do you get a teller to freeze and not

25  press the panic button without a gun?

1          If I'm a teller -- there are six, seven, eight bank

2   employees in this bank.  Every one of them has a buzzer

3   underneath their desk.  How do I get them all to stand up and

4   freeze and not hit that buzzer without guns?  How do I get the

5   teller to open the vault with 200,000 or whatever is in there

6   without guns?  Do I arm wrestle them?  No.  I point a gun at

7   them, and I threaten them with their lives.  That is how you do

8   this.

9          It makes no sense.  No sense.  Your common sense

10  should tell you that, of course, he knew that guns were going

11  to be involved.  Because the only other type of robbery that

12  Willie Harper said in his 14 years, 10 robberies per year, 140

13  robberies that he's investigated over his time with Wells Fargo

14  across Georgia -- has there ever been, he said, a

15  takeover-style robbery without guns?  No.  Because the other

16  style robbery that occurs is a note-passer, a note job.

17         How does this one work?  Well, Willie Harper told you

18  that you walk into the bank dressed like everybody else.  No

19  guns.  No masks.  No hoodies.  No gloves.  You come in looking

20  like a regular customer.  You get in line.  You fill out your

21  paper.  You hand it to the teller.  But what the note says is,

22  I have a gun.  Give me all your money.  And the teller --

23  tellers are actually trained to do that.  Then they walk out

24  like nothing happened.  No one knows.

25         Could I get Exhibit 23.

1          Does that guy look like a note-passer to you?  When

2    Kayode Adeleye testified, all 6-6 of him or whatever he was --

3    did he look like a note-passer to you?  Of course not.  This

4    was not a note job.  This was a takeover robbery.

5          But, of course, there is more evidence than just what

6    happened in the bank that day.  That is because Kayode Adeleye

7    testified and told you what happened before this robbery.  He

8    told you about the plan.

9          Ryan Hill didn't know about the gun just moments

10   before.  Although that would be sufficient to convict.  Ryan

11   Hill knew about this a week -- more than a week before.  Ryan

12   Hill had the wheels.  Ryan Hill had the wheels.  That is what

13   Kayode Adeleye said.  Meaning, he had the getaway car.

14         But he didn't just have the wheels.  He had the

15   brains.  He -- he is the brains behind the operation.  He is

16   the brains, and Bruce Brown and Kayode Adeleye are your muscle.

17   They are the goons who rough up the tellers and guard the door.

18   And he is the one who is too smart to get caught with the gun.

19         You heard that Ryan Hill provided the getaway car.

20   That is the rental Xterra.  Ryan Hill provided the switch car.

21   That is the white Mercedes.  Ryan Hill identified the target

22   bank with Connie Montoya.  Ryan Hill provided his gun to Kayode

23   Adeleye.  Why?  Because Adeleye is a convicted felon.  He told

24   you that.  He can't have guns.  He doesn't walk around with

25   guns.  Hill gave Adeleye his gun.

And you know what?  Adeleye said, I thought Hill was going to have a gun.  And the teller said, I thought that he had a gun.  He walks in with his hand in his pocket like he had one.  But he's too smart to get caught with it.

He is the brains behind the operation.  No wheels.  No brains.  No bank robbery.  If they had succeeded -- what did Kayode Adeleye say about how they would split the proceeds?  Evenly.  Why?  Because they had roles.  They were in it together.

Brown held the door.  Adeleye roughed up the tellers.  Hill took the money.  They need each of those parts to succeed.  If they don't have all those parts, they don't succeed.  They succeed together.  They should be held accountable together.

That is why there is aiding and abetting liability.  That is why the evidence in this case supports a finding of guilt on Count 3.  Ryan Hill is guilty of Count 3.  Thank you.

THE COURT:  All right.  It wasn't so long that you shouldn't be able to proceed at this juncture.

Are you ready?

MR. NORTON:  So go ahead?

THE COURT:  Yes.

CLOSING ARGUMENT

MR. NORTON:  Ladies and gentlemen, first, let me thank you for your attentiveness to the Court, and I appreciate it.  I want to -- I want to say a couple of things really about

1    what the -- sort of the zoomed-out larger picture view of what

2    it is we're here for and specifically what you're here for.

3    I'll get to that in a second.

4           But, first, while it is fresh on my mind, I want to

5    speak to some of the things that the Government has raised in

6    their closing.  The format here is they get to speak to you.

7    Then I get the last opportunity I'm going to have to speak to

8    you about the evidence that you have heard and the issues that

9    are in front of you.  And that is what I'm doing right now.

10   And they get a chance to come back.

11          But let me go ahead and speak to some of the things

12   that have been presented to you so far.  First of all, aiding

13   and abetting.  What is necessary to understand here is the --

14   you know, there's facts, and there's law.  You have heard

15   already and soon you'll hear again as you are being instructed

16   by the Judge before you go out to deliberate that you're the

17   finders of fact but the Judge determines what the law is.

18          Well, if you think about that -- I mean, that sounds

19   like a nice clean separation.  But it is not perfectly like

20   that.  It can't be because what facts are you going to find.

21          Well, ones that the law determines are relevant,

22   pertinent to the issues, and the issues are framed by what the

23   charges are.  What law applies?  Well, it depends on what the

24   facts are.  So there is a little bit of interaction there.  And

25   the form of that interaction is when the Judge gives you

 1  instructions.

 2          So the Judge is going to tell you what the law is so

 3  that when you go make determinations of fact you're making

 4  determinations of fact that are pertinent to the legal issues

 5  in play in this case.  That is how it works.  That is why the

 6  Judge's instructions to you are going to be so important.

 7          So aiding and abetting, well, that is a legal

 8  concept.  The concept is that you can be liable for something

 9  that somebody else does -- criminally liable.  That is the

10  essence of what aiding and abetting is.  It is an indirect

11  liability.  Because as I have said and I'll probably say it

12  again, Mr. Hill did not have a gun.  Yet he has got a gun

13  charge.  Why does he have a gun charge?  Because somebody else

14  has a gun.

15          The charge is -- the contention is that he was aiding

16  and abetting those people in having a gun.  Not the bank

17  robbery.  That is off the table.  But aiding and abetting them

18  in having the gun is what the charge is.

19          Now, there is a limitation on aiding and abetting.

20  You're not just automatically liable for anything that anybody

21  else does that is also involved in the criminal act with you.

22  Now, that limitation doesn't apply with respect to armed bank

23  robbery.  That is why he pled guilty to it.

24          But the limitation does apply to the gun charge.  Let

25  me explain that.  That is where this phrase advance knowledge

 1    comes in that you have heard over and over again.  Advance

 2    knowledge.  Did he have advance knowledge?  And getting to what

 3    the Judge is going to charge you about advance knowledge, it

 4    goes like this:  A person who aids and abets a crime of using

 5    or carrying a firearm -- that is the gun charge we're talking

 6    about -- in relation to a violent crime, same thing, can be

 7    found guilty even if the defendant did not personally use or

 8    carry the firearm.  The reason there is an issue for you to

 9    decide even though everybody agrees that Mr. Hill didn't have a

10    firearm is because they are saying this, that he aided and

11    abetted.

12          But to be found guilty on this basis, this aiding and

13    abetting basis, the defendant must have actively participated

14    in the violent crime with advance knowledge.  All right.  So

15    this is the law that is going to apply to frame the facts that

16    you're to determine.  Advance knowledge that another

17    participant would use or carry a firearm during and in relation

18    to violent crime.

19          A little more explanation about advance knowledge.

20    Advance knowledge means knowledge at the time when the

21    defendant chose to begin or continue the defendant's

22    participation in the violent crime.  The defendant chose to

23    continue the defendant's participation if the defendant learned

24    of the firearm and continued to participate.  What does that

25    mean?  The defendant did not choose to continue to participate

1    if the defendant learned of the firearm too late for the

2    defendant to be reasonably able to walk away.

3           Well, when is too late and what is reasonable?  Well,

4    that is for you to decide.  It is important here because you

5    may recall I was asking questions, how long did all this take?

6    The people who were actually present were kind of all over the

7    map about how much time it was.

8           Well, because what is reasonable?  I mean, at what

9    point are you committed to the point that you can't back out?

10   It is for you to determine.  So that's the limitation on aiding

11   and abetting liability that is specific to a 924(c) or a gun

12   charge, the only thing that is left in this whole case and that

13   is left for you to decide.

14          The second thing that I want to address about what

15   the Government has remarked to you in their closing argument --

16   Mr. Ghose is the one who argued.  Mr. Ghose told you that your

17   decision is, did Mr. Hill have advance knowledge?  That is what

18   he told you your decision was, the decision of fact.

19          Ladies and gentlemen, that is not -- not, not, not

20   the question.  That is not the question.  The question is

21   whether you have a reasonable doubt about the Government's

22   theory that he did have advance knowledge.  Now, let's talk

23   about that because it sounds like I'm saying the same thing

24   maybe if you listen quickly and you don't process.  But think

25   about it.  This is crucial.

1            I mean, half the things that go on in the world that

2    are disputed and people fight about is because they miss what

3    the real question is.  And very often it is not what seems to

4    be the question but an intermediate question.

5            In this case, the question is whether or not you have

6    a reasonable doubt, whether or not it is proven beyond a

7    reasonable doubt.  Think of it this way.  If you're only

8    supposed to do what the Government said you are supposed to do,

9    which is decide whether he had advance knowledge, it is kind of

10   like the scales are even.  Is it slightly more likely that he

11   had knowledge?

12           Well, if that is the case, if it is 51 percent more

13   likely, yeah, conviction.  But that is not how our criminal

14   justice system works.  That is not how it is supposed to work.

15   They have to prove it beyond a reasonable doubt.

16           Now, I'm going to speak a little bit more about that

17   burden of proof that they have in a second.  So let me just

18   leave that lie for a moment.  It is not the issue that the

19   Government has told you.  Please understand what it is you are

20   to decide.

21           Now, could I have Exhibit Number 21, please?

22           So another thing that the Government has stated to

23   you in their closing argument -- they made a statement --

24   Mr. Ghose made a statement of fact.  And this is -- this is --

25   yeah.

1          Of course, what you're supposed to decide -- what the

2    statement was was that the gun is visible to Ryan Hill.  That

3    is what you were just told.  The gun is visible to Ryan Hill in

4    Exhibit Number 21.  Exhibit 21 doesn't tell you that.  It is

5    not visible in Exhibit 21.  You can't see where that gun is.

6          Moreover, think about the circumstances.  They are

7    rushing in here.  Hill doesn't see either one of them come

8    through the door.  So he doesn't see the guns come out of their

9    clothing.  And now he is coming in.

10          This is -- this is -- the best that the

11    Government can come up with in their attempt to prove to you

12    beyond a reasonable doubt that he had advance knowledge is that

13    maybe he discovered it right then.  But it doesn't show you

14    that.

15          The Government-- Mr. Ghose -- talking about it

16    impersonally the Government.  But the Government has argued to

17    you that, look, he comes in; he is as cool as a cucumber; he

18    doesn't flinch.

19          Well, he doesn't flinch because he doesn't see the

20    gun.  He doesn't know that anything is amiss yet.  I mean, what

21    you are being told explains what Mr. Hill's version of

22    events -- of events has been all the way through.  Moreover,

23    even if he could have seen then as he's trying to pull this bag

24    out of his shirt and racing in, there's still a question to be

25    decided, not by the Government but by you, about whether or not

1    this is too late to be able to reasonably withdraw.  Remember,

2    that is a limitation on the aiding and abetting liability,

3    which is the only thing we have here.

4            Could I have Exhibit 13, please.

5            All right.  Another thing that the Government has

6    asserted to you in their closing argument is that that is what

7    Mr. Hill saw.  That is what Mr. Hill saw, as a way of saying to

8    you, see, Mr. Hill early in the event knew there was a gun out

9    there.

10            This picture, Exhibit Number 13, does not show you

11    that that is what Mr. Hill saw.  As a matter of fact, Mr. Hill

12    is behind this person.  He can't see the gun that is on the

13    other side of this very large 6-6 person.  There is no reason

14    to make that assertion.  The perspective is wrong.

15            If Mr. Hill had been standing where this camera is,

16    maybe he would see the same thing you're seeing in this

17    exhibit.  But he wasn't.  The Government just acknowledged

18    that.  He was where we just looked.

19            In addition, even if he did, there is still the

20    question for you alone to decide.  And that is, whether or not

21    it was too late -- him becoming aware it was too late for him

22    to be able to reasonably withdraw.

23            Another point from the Government's closing thus far

24    is someone is going to die.  And Mr. Hill heard that, as

25    asserted to you.  Well, did he?  You heard the evidence.  And

1    I'm not going to repeat what every witness said about that.

2    But I will kind of summarize it all as being quite equivocal

3    about whether or not Mr. Hill could have heard that.

4         I'm talking about the witnesses who were standing

5    right there.  In fact, one of the witnesses who was literally

6    right behind the spot where this is supposed to have

7    occurred --

8         You can take that down.

9         -- said I don't know if he could have heard it.  And

10   I understand some other witnesses went the other way.  But this

11   is not -- this is -- there's witnesses all over about that.

12        But, again, it is not -- it is not dispositive of

13   this case.  Why?  Because, first of all, you have to go from

14   that to there is a gun involved -- someone is going to die --

15   there is a threat being made to a gun being involved.  Well, it

16   could certainly be a gun.  It doesn't necessarily need to be

17   when you are standing next to somebody like Adeleye.

18        But, okay, let's say there is a gun.  When did it

19   happen?  Perhaps that is the -- that is the moment when it

20   comes into Mr. Hill's brain that, oh, my goodness, this is not

21   what we set up here.

22        So there is no evidence in the whole case about when

23   that happened in the process.  And it is up to you, again, you

24   alone, to decide whether or not it is too late to reasonably be

25   able to withdraw from the gun -- from the gun part.  Not the

1    bank robbery part.  From the gun.  From aiding and abetting the

2    others in the use of a gun.

3           The next thing that I want to comment on that the

4    Government has said -- I'm looking over your head because

5    there's clocks up there -- is, Mr. Norton said at the beginning

6    of the case -- he told you that this was a takeover.  But you

7    heard this -- one of the witnesses for Wells Fargo, well, that

8    is not how -- that is not what a takeover is at all.

9           I never used the phrase takeover.  I didn't use that.

10   What I said was strongarm.  But if you'll recall -- and I know

11   it is a couple of days ago -- but I told you then that this is

12   a phrase that I just made up.

13          These guys didn't sit around saying, okay, guys, we

14   can push a note; we can take out guns; we can do a strongarm.

15   Which will it be?  That discussion didn't happen.  What they

16   talked about doing was rushing in, grabbing the money, and

17   rushing out.  That is what they talked about doing.  And to

18   suggest that that is not among the possible ways that one --

19   that one can rob the bank is ridiculous.

20          I understand that the witness -- he seemed like a

21   smart guy.  He knows the system for Wells Fargo and how the

22   videos are taken and all that kind of stuff.  But you can't

23   just say, well, this is the way it is.  It is these certain

24   categories, and that is all -- in the entire universe of all

25   the bank robberies that ever occurred anywhere, it can only be

1    one of these two kinds.  And it is not the kind Mr. Norton

2    said; so, therefore, it had to involve the gun.  No.

3         These guys are -- these guys don't have Ph.D.s in

4    bank robbery.  They don't look at it that way in advance.

5    Think about a mugging that doesn't involve a gun.  Think about

6    a purse snatching.  Think about a sudden snatching of a cell

7    phone.  You read about that.  That is a fairly common thing.

8    None of these involve guns.

9         And it makes a lot of sense that if you're going to

10   do a robbery and you're not going to do it with a gun that you

11   could do it by this kind of rushing in sort of intimidation

12   thing.  I mean, after all, if you can rob a bank just by

13   slipping a piece of paper, wouldn't this be more effective and

14   yet short of using a gun?

15        And I don't know why -- why this was stated.  But it

16   was stated to you that this was not a note job, slipping a

17   note.  I never said it was a note job.  Obviously, it was an

18   armed bank robbery.  I mean, that is the only evidence you ever

19   had.  We don't deny that.

20        What we're saying is that Hill didn't set it up as

21   being a bank robbery.  And that sort of leads me to the last

22   thing I want to say about the Government's presentation before

23   I make a couple of comments to you about the burden of proof.

24        That is this assertion that Hill is the brains behind

25   this operation.  Really?  You have seen all of this evidence.

1    Is there -- is there any reasonable support in the evidence for

2    Hill being the brains behind the operation?  The Government's

3    own witnesses have said -- numerous of them -- that the

4    ringleader, quote-unquote, was Adeleye.  That the one, quote,

5    calling the shots, unquote, was Adeleye.  The one giving

6    directions in the bank and pointing off and watch that guy is

7    Adeleye.  From start to finish, this was Adeleye's operation.

8            As a matter of fact, Adeleye, remember, is the guy

9    who took the Fifth Amendment when asked about other bank

10   robberies.  It was Adeleye's idea -- Adeleye -- I'm not saying

11   Adeleye came up with every single detail.  Obviously the car

12   issue came up, and Mr. Hill participated in that.

13           But Adeleye -- if there was brains behind the

14   operation -- there weren't a whole lot of brains, period, in

15   this operation.  But if there were any brains behind the

16   operation, it was not Hill.  It was Adeleye.  Their own

17   evidence says that.

18           Now, let me say this about burden of proof.  This is

19   a little bit sort of zooming out, way out, and kind of

20   abstract.  And I hope you can follow this because it is really

21   important because it frames what you are supposed to do.

22           THE COURT:  You need to stop for a moment?

23           UNIDENTIFIED JUROR:  Yes.

24           THE COURT:  Let's stop for a second.  Let's just stop

25   the clock.

1          Is anyone else uncomfortable?

2                    **(There was a brief pause in the proceedings.)**

3                    **(The unidentified juror exited the courtroom at**

4          **11:46 A.M. and reentered the courtroom at 11:48**

5          **A.M.)**

6          THE COURT:  Ready?

7          MR. NORTON:  Okay.  It was actually a good place to

8     take a little breather because I am sort of turning the page,

9     so-to-speak, to this subject of burden of proof.  This relates

10    to your job here, your function here, the function of all of us

11    here as opposed to the specific facts in this case.

12          It is this:  It is clear that the burden of proof is

13    on the Government.  They have to prove the case.  We don't have

14    to disprove the case.

15          But there is another aspect to this burden of proof

16    that I want to speak to specifically and make sure that this is

17    ever present in your mind as you evaluate the evidence to

18    correctly understand what the issue is, as I pointed out

19    earlier.

20          It is not just that they have to come forward with

21    the evidence and we don't.  It is that they have to come

22    forward with the evidence to a certain level.  Certain level of

23    certitude, let's say.  The question is, how sure are you?

24    Okay.  The question is not does their version sound right or

25    not?  The question is:  How sure are you?

1           And the law actually speaks to that.  And the

2     instructions that the Judge will give you actually speak to

3     that.  And the answer is beyond a reasonable doubt.  So I

4     alluded earlier to, hey, the question can't simply be, is it

5     51 percent more likely?  That kind of standard of proof does

6     apply in some kinds of cases -- civil cases.  It is called a

7     preponderance standard.  But that is not what applies here.

8           This is a criminal case.  And in a criminal case, the

9     standard is different.  It is beyond a reasonable doubt.  That

10    means that if you are left with a doubt about the case that the

11    Government is trying to present to you, you should acquit.

12          Now, the word reasonable is in there.  That just

13    means you don't have to come up with some crazy notion of how

14    it is possible he didn't do it.  I mean, it has got to be

15    reasonable doubt.  But if you are left after reviewing all of

16    the evidence with a reasonable doubt about what the

17    Government is trying to convince you of, then you should

18    acquit.

19          In fact, let me say this about the jury verdict form

20    because this is subtle.  But it actually bears this out.  This

21    is typical.  The verdict form that you're going to get, the

22    piece of paper that you actually fill out to render your

23    verdict, the first item is, we find Ryan Vincent Hill, and

24    there is a line for not guilty and a line for guilty.  And you

25    check one of those.

1        Well, what that -- what that is telling you is you

2   notice it doesn't say guilty and innocent.  It is saying guilty

3   or not guilty when it means -- when it says not guilty, what it

4   really means is not guilty beyond a reasonable doubt.  Not

5   proven guilty beyond a reasonable doubt.  That is what that

6   means.

7        And let me explain.  It is built into our whole

8   system of justice, this idea, because we place a very high

9   value in our justice system and our conceptions of justice in

10  our society -- a very high value on trying to assure that there

11  is not one of these awful situations where somebody is

12  convicted and they are actually not guilty of it.

13        And so it is not a perfect system.  There is no

14  perfect system.  I mean, we are dealing with probabilities

15  here.  We're dealing with how we can know something.  Look, why

16  do we have trials in the first place?  We have trials because

17  we don't absolutely know 100 percent.  We have to listen to

18  some evidence and come to a decision as best we can.

19        If we could know guilty or not guilty 100 percent, we

20  wouldn't need a trial and you wouldn't have to be here.  So

21  that is not the system we have.  That is why we have these

22  standards of proof in place that have to be achieved.

23        So here -- here is the high value that is evinced in

24  our whole system here.  And it is this:  If there is going to

25  be a mistake made, for goodness sake, let's have the guilty

1    person go free rather than the innocent person be convicted.

2    Okay.  That is what is built into this standard.  So when I say

3    how sure are you, are you sure beyond a reasonable doubt?  That

4    is what this means.  That is why it is beyond a reasonable

5    doubt.

6           If it were just kind of, you know, I think the

7    Government's case is slightly more persuasive than what the

8    defense is trying to suggest to us, we don't really -- it seems

9    more likely, convict.  If that were the system, then not in

10   this trial but in all the trials everywhere there would be lots

11   of innocent people sitting in jail.  We don't want that.  That

12   is why we have this high standard.  That is why we should hold

13   the Government to this high standard.  And that is why, even if

14   you think he might be guilty but I have reasonable doubts, then

15   you must acquit.  Must find him not guilty.

16          Now, that is one thing I want to emphasize about the

17   burden of proof.  Here is something else.  And this is sort of

18   subtle, too.  If you look around at this room, it is grand, it

19   is palatial.  And if you think about what you have gone through

20   during yesterday and the day before and today, you see that

21   this system is -- it is very -- it is set up to run in a very

22   careful way.

23          You were segregated.  You were given instructions not

24   to talk with each other until it is time to deliberate.  You're

25   not supposed to intermingle.  You're not supposed to talk with

1   other people about the case and take all these precautions.  We

2   place a high degree of gravity on what we're about here.

3   Because the consequences can be large because a person's on

4   trial in a criminal case.  It is serious business.

5          And I worry sometimes that when we come in and we

6   counter all this and we think about the prosecuting authority

7   here is the United States.  It is the United States of America.

8   We're all patriotic Americans.  I believe in the United States.

9   And this is the United States -- the prosecutor; right?

10          Look at all of this.  They brought charges against

11   Mr. Hill.  So we need to evaluate to see, you know -- our job,

12   I guess, is to make sure the Government got it right.  No.

13   Please, please, please don't think about it that way.  Your job

14   is absolutely crucial here.

15          It is your responsibility -- this is not -- you're

16   not here to be kind of quality control inspectors for what the

17   Government does.  That is not what your function is.  You're

18   the sole trier of fact here.  And I urge you -- I know you'll

19   take that very seriously.  But I want you to think about that

20   when you think about what it is that you actually have to

21   decide and remember it is not, you know, if the Government is

22   right.  It is do you have reasonable doubts.

23          Now, I need to move along.  I am doing some things

24   out of order here, so bear with me.  Now, about this trial,

25   because this trial has been about bank robbery, which is a

1    little bit off actually because bank robbery is not an issue in

2    this case.  Well, you kind of can't help it because the bank

3    robbery -- the events of the bank robbery are relevant because,

4    you know, you can look at it.  You can draw inferences from

5    what you see.

6              But it also means that they get to retry the bank

7    robbery.  So you get to hear about the bank robbery over and

8    over and over again.  And it would be easy to think, well, you

9    know, he did a bank robbery.  We're not going to let this guy

10   go.

11             Well, Mr. Hill is going to be sentenced for that bank

12   robbery just like Mr. Adeleye.  The only thing left is this gun

13   charge.  So it is very important to focus in on what the

14   precise issue is.

15             Now, let me suggest to you that there are three --

16   there are three time frames here that you have heard evidence

17   about.  Let me make this distinction because this may actually

18   help you when you are trying to evaluate the different pieces

19   of evidence you get.

20             There's three time periods.  The first is the time

21   prior to walking into the bank.  The second relevant time

22   period is the time inside the bank.  And the third time period

23   is the time after.

24             Okay.  So it is really before, during, and after.

25   All right.  If you will think of it that way and follow me

1    here, let me help with some of this evidence that you have

2    heard.  All of the events that happened after I would say are

3    almost irrelevant.  And what I mean by that is he is no longer

4    aiding and abetting the use of a gun.  I mean, for a lot of the

5    time that you have heard evidence about, the guns were gone.

6    They have been discarded.  Remember, they were found.

7         I couldn't quite say it is totally irrelevant,

8    though.  Because after all, they did recover two guns, and they

9    charged with a gun.  So the fact that there's two guns, of

10   course, it turns out that the Government is completely

11   conceding that he didn't actually have a gun himself.

12        But it is still relevant that they find two guns.

13   And you can look at those guns and match them up to what you

14   see in pictures and the bank.  So you can say that it is

15   relevant on that basis.

16        But, really, everything that happened after they

17   leave the bank doesn't have anything to do with the thing that

18   you're being asked to decide.  So I urge you to give all of

19   that evidence very slight regard.

20        Now let's talk about what is happening in the bank.

21   During this event -- during this -- you know, was it a minute

22   like one person said?  Was it -- I think one of them went four

23   minutes.  We don't know.

24        But what happened in the bank?  Is it relevant?

25   Well, you can -- remember, the question is advance knowledge.

1    Advance means before.  Right?  Not during.  So why is it

2    relevant?

3            Well, it is relevant because you can watch what

4    happens during the event and you can say, well, was there

5    advance knowledge based on this?  You know, does this look like

6    Mr. Hill knew that there was guns is what it all comes down to.

7            And that is why you keep hearing about whether or not

8    there was planning and him being a mastermind and so on.

9    Because the inference you're being asked to draw is, well, yes,

10   he knows all about this -- this is carefully orchestrated.

11   This elaborate, as Adeleye said -- the word he used -- planning

12   and, therefore, how could he not know?  That is the inference.

13   That is how you can say the evidence of what is happening in

14   the bank is relevant.

15           However, you can -- with regard to that evidence, you

16   can easily overstate it.  Let me do a little contrast for you

17   on the events inside the bank versus after.  Okay.  During

18   versus the after.

19           I'm sorry.  I lost my train of thought.  Well, I was

20   talking about the events during the -- during the robbery.  The

21   only question is whether or not there is advance knowledge.

22   The evidence that you got of what happened during -- in the

23   during period was the videos and the photographs that you saw

24   over and over again.  They have the people -- some of the

25   people who were in the bank testify about what they saw.

1          Then what do you have about what happened before?

2     Remember, we're talking about advance knowledge.  So that is

3     the time period that most -- is most pertinent.  So let's think

4     about this.  If you are going to give very slight weight to the

5     evidence you hear after, you are going to look and give some

6     weight to the evidence you hear about what is happening during

7     the event.

8          The most weight would go to what happened before.

9     And that is where the Government's case is, Number 1, extremely

10    weak but, Number 2, full of holes.  It is full of holes because

11    of what you didn't hear.  You heard Adeleye, and that is

12    basically it.  Adeleye talked about what happened.

13         So you're supposed to decide what these -- what these

14    parties talked about before they go in to rob a bank based on

15    what Adeleye says?

16         How about Xavier Shields?  You didn't hear from him.

17    He was in the middle of all this.  Remember, he was in the

18    switch car.  It was his place that they went to.  But there is

19    no Xavier Shields.  And Xavier Shields is in the exact same

20    posture as Adeleye.  As a matter of fact, he pled guilty.  He

21    is going to be sentenced just like Adeleye.  He could come in

22    here and do himself some good.  Shields could.  But he is not

23    here.  And he is one of few people in the world that could

24    actually testify about what happened before so that you would

25    have some understanding about whether or not there really is

1    some advance knowledge on the part of Hill, like the

2    Government keeps asserting to you.  That is Xavier Shields.

3              How about Connie Montoya?  Connie Montoya was the guy

4    that went out and cased this bank and went inside and came back

5    and said, this is a great bank to rob.  But then said, well, I

6    don't want to be one of the people going in.  I'll just be a

7    lookout for you.

8              Connie Montoya is in the same situation as Adeleye.

9    Where is Connie Montoya?  He would be somebody that knew about

10   what happened before.  And that is the time period that is

11   really relevant here to advance knowledge.  Where is he?  He

12   didn't testify.  You didn't hear from him.

13             How about Brown?  Brown was a guy, remember, who not

14   only had to have participated in talking about how we're going

15   to go do this robbery, he actually had a gun.  He had his own

16   gun.  They are not contending that gun came from Mr. Hill.  But

17   he would know something about that.  Where is he?  He didn't

18   speak to you.

19             So the most relevant information out there that would

20   help you decide the case is not there.  It is perfectly

21   permissible for you to consider not only the evidence and the

22   inferences to be drawn from it but the inferences to be drawn

23   from the absence of evidence.

24             Now, let me speak to during the event.  I'll come

25   back to that.  You heard from Jerald Lawson.  He reiterated to

1    you that the big guy was in charge.  The big guy was not

2    Mr. Hill.  Mr. Hill is probably 140 pounds soaking wet.  It was

3    the guy you heard from, Adeleye.

4            With him, as with other witnesses, I tried to nail

5    down the best I can, okay, when?  When do you hear this threat

6    that might be an audible signal that there is a gun in play?

7    He couldn't say in terms of time.  Well, what about percentage?

8    Maybe 85 percent.

9            Well, it is for you to decide.  But that -- I suggest

10   to you that if that is the moment in time that Hill becomes

11   aware that there's guns in play that it is too late for him to

12   reasonably be able to walk away.

13           I'll mention this.  This is a little bit of an

14   aberration.  You heard from Ayrion Chandler who said it was --

15   boom, it was loud.  They came in.  They were aggressive.  The

16   big guy -- he, too, said that the big guy was loud and rough.

17   But his testimony is a little odd.  Remember, he said he had

18   the movie screen view.  And he kept saying that everybody had

19   guns.

20           Well, I perceived everybody had guns, he said.  But

21   even the Government is not saying that everybody had guns.  The

22   pictures don't say that everybody had guns.  Well, he had his

23   hands in his pocket.

24           Well, you know, this guy is a victim in the bank.  So

25   I understand that.  But gee.  There is -- there is not much

1    that is helpful from him.  He said -- he said, well, who was

2    the third guy?  Pointed to Ryan.  He doesn't know that it was

3    Mr. Ryan.  He has no way of knowing.  He was covered up.  He

4    just knows it was the smaller guy.

5            Now, you know it was Mr. Hill.  I know it was

6    Mr. Hill.  Mr. Hill pled guilty to it.  That is how we know.

7    But this guy didn't know.  And I say that to say that he was --

8    I would urge you to take his evidence this way:  That he is

9    very much primed to give the Government what -- what he thinks

10   will support the Government's position.  That is why he's going

11   to talk about, oh, it was collective, it was planned, and that

12   sort of thing.

13           If I can leave him for a moment and jump back to what

14   is happening afterwards.  You know, there was a lot of

15   discussion during the case about all this stuff that is after

16   the event.  It is not relevant.  You know, it shouldn't come

17   in.

18           Well, it actually tells you something that is

19   helpful.  Because on the question of how much planning had to

20   go into this bank robbery, think about this:  These guys leave

21   the scene.  They don't have a getaway driver as such.  One of

22   them is actually driving at least until they get to the switch

23   car.  They do switch cars.

24           Then at some point, they know that law enforcement is

25   after them somehow.  They don't necessarily know how do we have

1  a tracker device.  Is there a helicopter?  Who knows.  But they

2  know that they are made, so-to-speak.

3          Well, what happens next?  They drive and try to

4  elude.  They go down towards 65.  Adeleye says, go over here

5  behind this building.  We're going to go through and see if we

6  can find the tracking device and so on.  Hill says, well, I

7  know this area.  Let's go over here.  So they go to another

8  place.  They unload all the stuff.

9          Then they leave there.  They end up back at the

10  village -- Avalon Ridge apartments.  That is where they are

11  supposed to end up.  Then they jump into a van.  They are going

12  to escape from there.

13          Well, they don't plan.  They don't plan any of this.

14  This is the point.  They don't plan any of this.  They don't

15  plan to throw away all the money they just stole.  They don't

16  plan to go to this particular location in order to do that.

17  They don't plan -- they perhaps plan to go to Avalon Ridge.

18  But they don't plan to go there with the police in hot pursuit.

19  They, therefore, don't plan to jump out and go get in this van

20  that happens to be driven by Joe Montoya, a friend.  And like

21  Adeleye said, go take me to my car.  They don't plan any of

22  that stuff.

23          And yet it unfolds in a way -- I mean, they still get

24  caught eventually.  But they don't get caught right there.

25  What does this tell you?  Well, it doesn't tell you much about

1    the ultimate issue you're supposed to decide.  But it at least

2    tells you that it doesn't take a great deal of advance planning

3    like they are all sitting around a conference room somewhere,

4    you know, as if this is Ocean's Eleven and we're going to pull

5    the great heist in Las Vegas.  It is not like that.

6          These guys -- the plan is we need three of us.  We're

7    going to rush in.  We're going to grab the money, and we're

8    going to rush out.  Oh, and we're going to have a switch car;

9    and, oh, I can't come up with a car, the switch car.  Hill, can

10   you do it?  Yeah, I can do it.  I'm getting rid of my car

11   anyway.  That is the plan.  So that kind of planning does not

12   tell you that there is advance knowledge on Hill's part

13   specifically about using guns.

14         Now, let me go back and jump back to the during

15   phase.  The during phase -- the first -- maybe the second

16   witness that you heard of who was in the bank was the guy right

17   there with Adeleye.  So he has got Adeleye all over him.  This

18   was the tall guy you may remember because I asked him how tall

19   he was to compare with Adeleye.  He said that he was -- I think

20   he said he was 6-4 and that Adeleye might be taller.

21         He described Adeleye as the big guy, aggressive.  He

22   said that Hill may or may not have heard Adeleye's commands.

23   Although he is standing right there.  He acknowledged that

24   Adeleye is in between him and Hill.  He also acknowledged that

25   he couldn't say what Hill saw or didn't see.  This is the guy

1    closest to the whole thing.

2         He also said that Adeleye was the ringleader, Adeleye

3    was the coordinator, and Adeleye was calling the shots.  I

4    mention him in particular because you might say, well, gosh, at

5    some point, you have got to be aware that there's guns.  Well,

6    yeah, at some point.

7         But everything that the Government keeps trying to

8    tell you, well, it is at this point, it is at this point -- I

9    can't tell you exactly what point.  But I can say confidently

10   that the Government hasn't proven beyond a reasonable doubt

11   that they have -- that he had advance knowledge and that his

12   discovery was at a time too late to be able to do anything

13   about it.  Now, not the bank robbery but about the gun.

14        You heard from Jordan Peyton actually this morning.

15   And, you know, it was kind of -- I was actually looking at

16   this.  You know, you were shown this picture.  This is 3 and 4.

17        Actually, if you want to put up -- put up 4 if you

18   don't mind.

19        Remember, he said -- he is the guy -- well, his seat

20   would have been over here to the left.  And, remember, I had

21   all that discussion -- this was just this morning.  I had all

22   this discussion about exactly where this chair was.  If this is

23   his desk, it is right there.  So it is a few feet away from

24   where he sits.  It is out a little bit from the wall.  The wall

25   is out a little bit from the building.

1        Remember all that stuff?  All I was trying to say

2    was, look, the scene did not look like this.  And so having an

3    unobstructed view of exactly what was visible to you,

4    Mr. Witness -- forget Mr. Hill -- to you, Mr. Witness, is not

5    as it appears.

6            This big -- it is either this big sign or another big

7    sign was far closer to the door.  So it is -- it is necessarily

8    obstructing the view for somebody who is not even at the seat

9    next to the wall but across the desk from it.

10           So I'm not saying that this guy, Jordan Peyton,

11   doesn't know what he is talking about.  What I'm saying is he

12   doesn't have an unobstructed view.  He is saying it as best he

13   can about what he observed and when and so on.  But he doesn't

14   have an unobstructed view about exactly when the guns come out.

15   And he cannot say -- he cannot tell you in any kind of

16   convincing way how Mr. Hill as he is walking in would perceive

17   this in such a way that Mr. Hill would be aware.

18           All right.  I'm almost done.  I just -- I wanted to

19   say this last.  So going back to the time period before, let's

20   talk about Adeleye.  I want to make sure you have what you need

21   to be able to evaluate Mr. Adeleye.

22           Mr. Adeleye is the only evidence about where the gun

23   came from before, the only direct evidence on advance

24   knowledge.  It is only Adeleye that said I got the gun from

25   Hill despite the fact that Hill goes in without a gun.  That

 1   makes no sense.  Despite the fact that Adeleye says Hill

 2   doesn't carry a gun.  Well, where does this one come from?  You

 3   never heard any of that.  Was this gun reported stolen?  You

 4   never heard any of that.  Whose gun was this?  You never heard.

 5          Adeleye says that -- he acknowledged he is trying to

 6   get a 5K -- remember that?  Substantial assistance of

 7   cooperation.  He's wants a break.  He's angry at Hill.  Adeleye

 8   knows perfectly well this case was charged without him.  The

 9   only reason he was in the case is because Hill put him in the

10   case.  And the only reason Hill put him in the case -- well,

11   for one thing, it was just because he was being forthcoming

12   right from the beginning -- but also because two guys were

13   about to go to prison for something they didn't do if he didn't

14   fess up and say who it was.  Hill was willing to do that but

15   not Adeleye.

16          THE COURT:  Sir, your time is up.

17          MR. NORTON:  All right.  Thank you.

18                    CLOSING ARGUMENT

19          MR. GHOSE:  All right.  There are a lot of things I

20   would like to respond to.  But I think the way to begin -- the

21   best way to begin is actually with video -- some of the video

22   itself.

23          And when I first spoke with you in my first closing,

24   I said I'm just going to talk -- I didn't want to play the

25   video.  I think now after hearing what Mr. Norton said, I think

1    it is appropriate to see some of this.

2            The first one I want to show you is Exhibit Number 8.

3    This is the camera behind Vada Faniel's teller station.

4                    **(Playing of the videotape.)**

5            MR. GHOSE:  Pause.

6            How long did that take for that to happen?  How long

7    did that take?  You know that Ryan Hill is walking in, and he

8    is seeing this because how can he not see it?  And why do

9    people put their hands up?  Because guns are pointed at them.

10           Can we have Exhibit 25, please?

11                   **(Playing of the videotape.)**

12           MR. GHOSE:  Now, this is the clip that you heard and

13   that you saw from the exterior.  That is the bank robbers' car

14   pulling up, backing into the handicap stop that you heard

15   Ayrion Chandler describe.  Who gets out first?  Adeleye.  Who

16   gets out second?  Bruce Brown.  Who has the guns?  Adeleye and

17   Brown.  And then who is that running in last?  Ryan Hill.

18           Okay.  Now, please, Exhibit Number 11.

19                   **(Playing of the videotape.)**

20           MR. GHOSE:  As you can see, this is the video -- you

21   recall this one -- of the front door.  Adeleye, gun comes out.

22   Brown, gun is already out.  Hill walking directly toward the

23   teller station.  What does -- what does Ryan Hill walk directly

24   into?

25           Exhibit 13, please.

1        That is what he walks into.  Now, Mr. Norton is

2    saying maybe he didn't see that gun because he's looking at it

3    from behind Mr. Adeleye.  But you know what he is seeing?  He

4    is seeing Remonte Griffin's hands up just like he is seeing

5    Vada Faniel's hands up and just like he's seeing the other two

6    customers' hands up.

7        Mr. Norton said that reasonable doubt -- I'm trying

8    to get this as precise as what he said.  Reasonable doubt is

9    not some crazy notion.  The crazy notion would be that Ryan

10   Hill didn't know that guns were involved in this robbery.  That

11   is a crazy notion.  What is reasonable is to conclude that he

12   knew.  He knew the moment that he walked in and continued to

13   participate.

14       But the jury instruction that Judge Totenberg will

15   read to you soon is that even if he didn't know that precise

16   moment that he walked in, if he started to participate in the

17   bank robbery and continued to participate in the bank robbery

18   after having learned that guns are involved in this bank

19   robbery, provided that he could still at that moment walk away,

20   he is still guilty.

21       So please play Exhibit 11.  I'm sorry.  Not 11.  I

22   think it is Exhibit 10.

23                **(Playing of the videotape.)**

24       MR. GHOSE:  Okay.  This is the camera that shows what

25   is happening behind the teller counter.  That is Remonte

1    Griffin's hands on the left.  That is Kayode Adeleye jumping

2    the counter; Jay Lawson coming around.  Ryan Hill is coming

3    around in the blue gloves.  What is happening alongside Ryan

4    Hill?  You'll see it in a moment.  Kayode Adeleye with a gun to

5    Vada Faniel.  First his back.  Then his chest.

6            Pause it.  Pause it, please.

7            How close are they together?  How close are they

8    together?  The crazy notion is that Ryan Hill didn't know guns

9    were involved.  Could he have still walked away?  What is

10   stopping him from walking away if he doesn't want to

11   participate in an armed bank robbery and the use of a firearm

12   during a crime of violence?  Nothing is stopping him.

13           But what does he do?  As Jordan Peyton said, calm and

14   collected and he continued on.

15           Keep playing it, please.

16                **(Continuation of the playing of the videotape.)**

17           MR. GHOSE:  In a bank this size, as Adeleye shouts

18   instructions to people on the other side of the bank.

19           I need you to stop it, please.  Exhibit 16.

20           What is happening here?  You heard that Adeleye is

21   pointing a gun at a teller who is at the drive-thru window who

22   is laying on the ground.  What is Ryan Hill doing?

23           Do Exhibit 6.

24           This is a small space.  Look how small that space is.

25   What is the crazy notion here?  The crazy notion is that Ryan

1    Hill somehow didn't know that he was participating in a robbery

2    involving guns.

3              All right.  Now you can take that down.  Thank you.

4              There's a few other points that I want to make.  This

5    is enough, ladies and gentlemen.  This is enough to convict

6    Ryan Hill.  But you have more.  And you don't just have Kayode

7    Adeleye telling you what happened before the robbery.  You have

8    Ryan Hill himself.

9              You heard Ryan Hill's admissions, statements that he

10   then adopted as true during his guilty plea to Counts 1 and 2.

11   Mr. Moultrie read this into the record.  He was under oath.  It

12   was after being advised of his rights by the Judge.  That

13   statement is the most reliable statement.

14             We don't need to bring in Xavier Shields and Connie

15   Montoya and all these other people because Ryan Hill himself

16   agreed that Connie Montoya was acting as a lookout.  Ryan Hill

17   agreed that Xavier Shields was waiting at a parking lot nearby

18   the apartment building while the robbery took place.  Ryan Hill

19   agreed that Shields arrived at a lot in the white Mercedes AMG

20   which was leased by Mr. Hill.

21             Ryan Hill agreed that after replacing the license

22   plate of the Xterra with a stolen plate to elude law

23   enforcement Hill and Adeleye and Brown fled the scene together

24   in the AMG and Shields fled in the Xterra.  Hill agreed that

25   Montoya was nearby in a rented white minivan and that Shields

1    had met up at Shields' apartment.  And Ryan Hill agreed that he

2    was the driver of the white Mercedes.

3          And it goes on.  So much of this has been already

4    agreed to.  What he doesn't agree to is what Xavier Shields or

5    Kayode Adeleye provided to you, which is that he handed Hill

6    that gun to use during that robbery.

7          But the circumstantial evidence is so strong even

8    without that.  Judge Totenberg will instruct you that

9    circumstantial evidence is evidence that you can infer based on

10   what you have seen.

11         What reasonable inferences can you make based on what

12   you have seen?  Given the level of planning before, during, and

13   after the robbery, the reasonable inference is that Ryan Hill

14   knew exactly what this was all about.  You don't have to be a

15   leader to have advance knowledge.  But Ryan Hill was the

16   leader.  There were two more.

17                    **(There was a brief pause in the proceedings.)**

18         MR. GHOSE:  There's a few more points I want to make

19   before I sit down, and the Judge will then instruct you, and

20   you can begin your deliberation.

21         Did Kayode Adeleye seem credible to you?  You are the

22   best situated to judge his credibility.  You sat here and

23   listened to him testify.  He was calm.  He was collected.  He

24   was truthful.  If he made a mistake, he acknowledged it.  He

25   may have made a mistake about that Buick.  He acknowledged

1   that.

2           Did he seem like he was lying when everything that he

3   is saying is corroborated by Ryan Hill's own statements about

4   what happened before, by the physical evidence that happened

5   afterwards, by what you saw for yourself using the video?  Is

6   he credible?

7           Mr. Adeleye was asked about a sentencing reduction.

8   And he seemed to think that he wasn't even sure if he could

9   still get it.  Is that what was driving him to testify?  Kayode

10  Adeleye testified, and everything else in this case

11  corroborated what he said.

12          Mr. Norton has argued that what happened afterwards

13  is irrelevant.  But it is not.  It corroborates what

14  Mr. Adeleye said, and it shows the level of planning that was

15  involved.

16          Now, there was one mention about Mr. Adeleye by him

17  pleading the Fifth.  That is his constitutional right.  He is

18  permitted to do that.  It is when he was asked about other

19  criminal conduct, other bank robberies I believe.

20          But let's just suppose for a moment that you believe

21  the defense's theory that Mr. Adeleye is a seasoned bank

22  robber.  He's an expert.  That appears to be what their theory

23  is.

24          If he is an expert, do you think that he would have

25  failed to have discussed the single most important fact about

1   how you commit a takeover robbery?  Guns.  What is the key

2   ingredient to a takeover robbery?  Guns.  And what did you hear

3   from him?  The day before the robbery happened, they got suited

4   up.  They went to the bank.  They were 100 feet away, I believe

5   he said, or 100 yards away.

6          Connie Montoya then said there is an APD cruiser

7   nearby.  And they aborted the mission.  They were this close to

8   going in.  They had their guns.  Adeleye gave his gun back to

9   Hill.  They are that close, and he is a seasoned expert.  And

10  somehow Ryan Hill who is in on this is unaware of the key

11  ingredient to a takeover robbery, which is firearms.

12         It is not reasonable.  That is not a reasonable

13  conclusion.  That is a crazy notion.  The reasonable conclusion

14  is that Ryan Hill knew, had advance knowledge of the use of

15  firearms, and is guilty of Count 3.  Thank you.

16         THE COURT:  Thank you, Counsel.  Ladies and

17  gentlemen, if anyone needs to use the restroom right now, let's

18  do so.  If you need to, stand for a few minutes.  But I would

19  like to resume and give you the instruction in the next five

20  minutes.

21              **(The jury exited the courtroom at 12:27 P.M.,**

22                 **and a brief break was taken.)**

23         THE COURT:  I'm going to have the jury back.

24  Gentlemen, we're going to have the jury back.

25              **(The jury entered the courtroom at 12:33 P.M.)**

```
 1                              CHARGE

 2            THE COURT:  Ladies and gentlemen, first of all, thank

 3   you very much for your attention and your patience.  There was

 4   a little bit of jumping up and down when we've had conferences

 5   when you have had to wait for us.  You have been a great jury.

 6            It is now my duty to instruct you on the rules of law

 7   that you must follow and apply in deciding the case.  So

 8   closing arguments are through.  You're going to go to the jury

 9   room and begin your discussions after I complete my

10   instructions to you.

11            You can decide you're going to deliberate during

12   lunch, or you can have lunch and just free your mind and do it

13   afterwards.  It is up to you.  And that really is totally up to

14   you as to how you're going to proceed.

15            But it will be your duty to decide whether the

16   Government has proved beyond a reasonable doubt the specific

17   facts necessary to find the defendant guilty of the crime

18   charged in the superseding indictment in Count 3.

19            Your decision must be based only on the evidence

20   presented here.  And you must not be influenced in any way by

21   either sympathy for or prejudice against the Government or the

22   defendant.

23            And I want to assure you -- you can take notes of

24   anything I say here.  But I will give you a copy of my charge

25   here as well.
```

434

1          You must follow the law as I explain it even if you

2    do not agree with the law, and you must follow all of my

3    instructions as a whole.  You must not single out or disregard

4    any of the Court's instructions on the law.

5          The indictment or formal charge against a defendant

6    is not evidence of guilt.  The law presumes every defendant is

7    innocent.  The defendant does not have to prove his innocence

8    or produce any evidence at all.  A defendant does not have to

9    testify.  And as the defendant, Ryan Vincent Hill, chose not to

10   testify, you cannot consider that in any way when making your

11   decision.  The Government must prove guilt beyond a reasonable

12   doubt.  If it fails to do so, you must find Mr. Hill not

13   guilty.

14         The Government's burden of proof is heavy.  But it

15   does not have to prove a defendant's guilt beyond all possible

16   doubt.  The Government's proof only has to exclude any

17   reasonable doubt concerning the defendant's guilt.  A

18   reasonable doubt is a real doubt based on your reason and

19   common sense after you have carefully and impartially

20   considered all the evidence in the case.

21         Proof beyond a reasonable doubt is proof so

22   convincing that you would be willing to rely and act on it

23   without hesitation in the most important of your own affairs.

24   If you are convinced that the defendant has been proved guilty

25   beyond a reasonable doubt, say so.  If you are not convinced,

1    say so.

2         As I said before, you must consider only the evidence

3    that I have admitted into this case.  Evidence includes the

4    testimony of witnesses and the exhibits admitted.  But anything

5    the lawyers say is not evidence and is not binding on you.

6         You should not assume from anything I have said that

7    I have any opinion about any factual issue in this case.

8    Except for my instructions to you on the law, you should

9    disregard anything I may have said during the trial in arriving

10   at your own decision about the facts.  Your own recollection

11   and interpretation of the evidence is what matters.

12        In considering the evidence, you may use reasoning

13   and common sense to make deductions and reach conclusions.  You

14   should not be concerned about whether the evidence is direct or

15   circumstantial.

16        Direct evidence is the testimony of a person who

17   asserts that he or she has actual knowledge of a fact, such as

18   an eyewitness.  Circumstantial evidence is proof of a chain of

19   facts and circumstances that tend to prove or disprove a fact.

20   There is no legal difference in the weight you may give to

21   either direct or circumstantial evidence.

22        Now, when I say you must consider all the evidence, I

23   do not mean that you must accept all the evidence as true or

24   accurate.  You should decide whether you believe what each

25   witness has to say and how important that testimony was.

1              In making that decision, you may believe or

2    disbelieve any witness in whole or in part or not at all.  The

3    number of witnesses testifying concerning a particular point

4    does not necessarily matter.  To decide whether you believe any

5    witness, I suggest that you ask yourself a few questions.  Did

6    the witness impress you as one who was telling the truth?  Did

7    the witness have any particular reason not to tell the truth?

8    Did the witness have a personal interest in the outcome of the

9    case?  Did the witness seem to have a good memory?  Did the

10   witness have the opportunity and ability to accurately observe

11   the things he or she testified about?  Did the witness appear

12   to understand the questions clearly and answer them directly?

13   Did the witness' testimony differ from other testimony or other

14   evidence?  What was the witness' manner while testifying?  Was

15   the witness' testimony contradicted by other testimony or

16   evidence?  You may also consider any other factors that bear on

17   credibility or believability.

18              The Government must prove beyond a reasonable doubt

19   that the defendant was the person who committed the crime.  If

20   a witness identifies a defendant as the person who committed

21   the crime, you must decide whether the witness is telling the

22   truth.  But even if you believe the witness is telling the

23   truth, you must still decide how accurate the identification

24   is.

25              I suggest that you ask yourself questions, such as:

1   Did the witness have an adequate opportunity to observe the

2   person at the time the crime was committed?  How much time did

3   the witness have to observe the person?  How close was the

4   witness?  Did anything affect the witness' ability to see?  Did

5   the witness know or see the person at an earlier time?

6          You may also consider the circumstances of the

7   identification of a defendant, such as the way the defendant

8   was presented to the witness for identification and the length

9   of time between the crime and the identification of the

10  defendant.

11         You shall also ask yourself whether there was

12  evidence that a witness testified falsely about an important

13  fact and ask whether there was evidence that at some other time

14  a witness said or did something or did not say or do something

15  that was different from the testimony the witness gave during

16  the trial.

17         To decide whether you believe a witness, you may

18  consider the fact that the witness has been convicted of a

19  felony or a crime involving dishonesty or a false statement.

20         But keep in mind that a simple mistake does not mean

21  a witness was not telling the truth as he or she remembers it.

22  People naturally tend to forget some things or remember them

23  inaccurately.  So if a witness misstated something, you must

24  decide whether it was because of an innocent lapse in memory or

25  an intentional deception.  The significance of your decision

1   may depend on whether the misstatement is about an important

2   fact or about an unimportant detail.

3            You must consider some witnesses' testimony with more

4   caution than others.  For example, witnesses who hope to gain

5   more favorable treatment in their own cases may have reason to

6   make a false statement to strike a good bargain with the

7   Government.

8            Further, in this case, the Government has made plea

9   agreements with certain codefendants in exchange for their

10  testimony.  Such plea bargaining, as it is called, provides for

11  the possibility of a lesser sentence than the codefendant would

12  normally face.  Plea bargaining is lawful and proper, and the

13  rules of this Court expressly provide for it.

14           So while witnesses of this -- this kind may be

15  entirely truthful when testifying, you should consider that

16  testimony with more caution than the testimony of other

17  witnesses.

18           And the fact that a witness has pled guilty to an

19  offense is not evidence of the guilt of any other person.

20           After examining all of the evidence, if you have a

21  reasonable doubt that the defendant was the person who

22  committed the crime, you must find the defendant not guilty.

23           You will see that the indictment charges that certain

24  crimes were committed on or about a certain date.  The

25  Government does not have to prove that the offense occurred on

1    an exact date.  The Government only has to prove beyond a

2    reasonable doubt that the crime was committed on a date

3    reasonably close to the date alleged.  The word knowingly means

4    that an act was done voluntarily and intentionally and not

5    because of a mistake or by accident.

6              I caution you that the defendant is on trial only for

7    the specific crime charged in Count 3 of the superseding

8    indictment.  You are here to determine from the evidence in

9    this case whether the defendant is guilty or not guilty of that

10   specific crime.  So while you're going to have the indictment

11   that includes Counts 1, 2, and 3, you're only -- the only

12   charge in front of you to decide is Count 3.

13             You must never consider punishment in any way to

14   decide whether the defendant is guilty.  If you find the

15   defendant guilty, the punishment is for the Judge alone to

16   decide later, meaning me.

17             You will see that the indictment given to you for

18   your review during your deliberation charges several criminal

19   offenses called counts against multiple defendants.  And,

20   again, I caution you that the only criminal offense at issue is

21   whether defendant Hill committed the offense charged in

22   Count 3, which charges his use or carrying a firearm during and

23   in relation to a violent crime.

24             It is a separate federal crime to use a firearm

25   during and in relation to a violent crime.  The defendant can

1   be found guilty of this crime only if all of the following

2   facts are proven beyond a reasonable doubt:  First, that the

3   defendant committed the violent crime charged in Count 2 of the

4   superseding indictment.  That is, the armed bank robbery.  And,

5   secondly, during and in relation to that crime, the defendant

6   knowingly used or carried a firearm as charged in the

7   superseding indictment.

8          In this superseding indictment, the defendant is

9   charged with using or carrying a firearm during and in relation

10  to a violent crime.  That is, the armed bank robbery, which the

11  armed bank robbery is charged in Count 2.  I instruct you that

12  the defendant has previously pled guilty to Count 2 of the

13  superseding indictment.

14         A firearm is any -- again, that he has pled guilty --

15  that means to the armed bank robbery.

16         A firearm is any weapon designed to or readily

17  convertible to expel a projectile by the action of an

18  explosive.  To use a firearm means more than a mere possession

19  and more than proximity and accessibility to the firearm.  It

20  requires active employment of the firearm by brandishing or

21  displaying it in some fashion.  I will further explain

22  brandishing to you in a moment.

23         To carry a firearm is to have the firearm on one's

24  person or to transport the firearm such as in a vehicle from

25  one place to another while committing the violent crime.  To

1    use or carry a firearm in relation to a crime means that the

2    firearm had some purpose or effect with respect to the crime

3    and was not there by accident or coincidence.  The firearm must

4    have facilitated or had the potential of facilitating the

5    crime.

6         If you find the defendant guilty of using or carrying

7    a firearm during and in relation to a violent crime, you will

8    answer an additional question about the firearm, whether the

9    firearm was brandished.  The Government has the burden of proof

10   on this question, and the standard again is proof beyond a

11   reasonable doubt.

12        It is possible to prove the defendant guilty of a

13   crime even without evidence that the defendant personally

14   performed every act charged.  Ordinarily, any act a person can

15   do may be done by directing another person or agent, or it may

16   be done by acting with or under the direction of others.

17        A defendant aids and abets a person if the defendant

18   intentionally joins with the person to commit a crime.  A

19   defendant is criminally responsible for the acts of another

20   person if the defendant aids and abets the other person.  A

21   defendant is also responsible if the defendant willfully

22   directs or authorizes the acts of an agent, employee, or other

23   associate.

24        But finding that a defendant is criminally

25   responsible for the acts of another person requires proof that

1    the defendant intentionally associated with or participated in

2    the crime, not just proof that the defendant was simply present

3    at the scene of the crime and knew about it or knew about it.

4         In other words, you must find beyond a reasonable

5    doubt that the defendant was a willful participant and not

6    merely a knowing spectator.

7         Further, a defendant who aids and abets the crime of

8    using or carrying a firearm during and in relation to a violent

9    crime can be found guilty even if the defendant did not

10   personally use or carry the firearm.  But to be found guilty on

11   this basis, the defendant must have actively participated in

12   the violent crime with advance knowledge that another

13   participant would use or carry a firearm during and in relation

14   to the violent crime.

15        Advance knowledge means knowledge at a time when the

16   defendant chose to begin or continue the defendant's

17   participation in the violent crime.  The defendant chose to

18   continue the defendant's participation if the defendant learned

19   of the firearm and continued to participate.  But the defendant

20   did not choose to continue to participate if the defendant

21   learned of the firearm too late for the defendant to be

22   reasonably able to walk away.

23        Now, if you find the defendant guilty of using or

24   carrying a firearm during or in relation to a crime of

25   violence, you must also determine if the defendant brandished

1    the firearm during and in relation to a crime of violence.   To

2    brandish a firearm means to show all or part of the firearm to

3    another person or otherwise make another person aware of the

4    firearm in order to intimidate that person.   The firearm may

5    not be directly visible to the other person.

6            The defendant is guilty of aiding and abetting the

7    brandishing of a firearm if he had advance knowledge that

8    another participant in the crime would display or make the

9    presence of a firearm known for the purposes of intimidation.

10   The defendant need not have had advance knowledge that a

11   participant would actually brandish the firearm.   This

12   requirement is satisfied if the defendant knew that a

13   participant -- a participant intended to brandish a firearm to

14   intimidate if the need arose.

15           You have been permitted to take notes during the

16   trial.  Most of you, perhaps all of you, have taken advantage

17   of that opportunity.  You must use your notes only as a memory

18   aid during deliberations.  You must not give your notes

19   priority over your independent recollection of the evidence.

20   And you must not allow yourself to be unduly influenced by the

21   notes of other jurors.  I emphasize that notes are not entitled

22   to any greater weight than your memories or impressions about

23   the testimony in evidence.

24           Your verdict, whether guilty or not guilty, must be

25   unanimous.  Everyone must agree.  In other words, you have to

444

1    come to consensus if that is -- if that is -- if you can.  Your

2    deliberations are secret.  And you will never have to explain

3    your verdict to anyone.

4         Each of you must decide the case for yourself but

5    only after fully considering the evidence with the other

6    jurors.  So you must discuss the case with one another and try

7    to reach an agreement.  While you are discussing the case, do

8    not hesitate to reexamine your own opinion and change your mind

9    if you become convinced that you are wrong.  But do not give up

10   your honest beliefs just because others think differently or

11   because you simply want to get the case over with.

12        Remember that in a very real way you are the judges,

13   judges of the facts.  Your only interest is to seek the truth

14   from the evidence in this case.

15        When you get back to the jury room, choose one of

16   your members to act as a foreperson.  The foreperson will

17   direct your deliberations and will speak for you in court.

18   Please only deliberate in the jury room, not in the lunchroom

19   downstairs or obviously in the hallways, and only deliberate

20   when all of you are present.

21        A verdict form has been prepared for your

22   convenience, and I'm going to go over it with you very briefly

23   here.  So the first question as the defendant is charged in

24   Count 3 of the superseding indictment, which you'll have, we,

25   the jury, find the defendant Ryan Vincent Hill not guilty or

1    guilty.

2          Now, if you find the defendant not guilty as charged

3    in Count 3, then you're just going to go ahead to the very end,

4    so say we all, signed and dated.  The foreperson will sign, and

5    you don't have to answer Question 2.  In other words, don't

6    answer Question 2.

7          If you find the defendant guilty of Count 3, then you

8    have to answer the question that is identified under

9    Question 2.  And there it is asking you to find with respect to

10   Count 3 whether the firearm was not brandished or was it

11   brandished.  You'll use again -- refer back to my instruction

12   to you as to how you decide that.

13         You'll have the verdict form and the evidence brought

14   back to you as well as my instructions to the jury room.  And

15   when you have agreed on a verdict, if you have agreed, your

16   foreperson must fill in the form, sign it, date it, and notify

17   the security officer from the marshal's office.  And it will be

18   carried in.  And then I will read the verdict here in the

19   courtroom.

20         Now, if you wish to communicate with me at any time,

21   please write down your message or question and give it to the

22   marshal and the foreperson should sign it.  The marshal will

23   bring it to me, and I will respond to it as promptly as

24   possible either in writing or by talking to you in the

25   courtroom.  And you'll come back here, and the counsel will be

1    present, and I'll read the question, and I'll respond to you,

2    and I usually will have reviewed the question with them in

3    advance.

4           But I caution you to not tell me how many jurors have

5    voted one way or the other at any time during the deliberation

6    process.  All right.

7           All right.  Well, that is it.  So you're on your own

8    at this juncture.  And you can decide how you are going to

9    proceed again as to lunch.  And Ms. McConochie will bring

10   everything to you.

11          Thank you very much again.

12          **(The jury exited the courtroom at 12:55 P.M.)**

13          MR. GHOSE:  I think we need to dismiss the alternate

14   jurors.

15          THE COURT:  Is there any objection to my dismissing

16   the alternate jurors?  It doesn't seem like they are going to

17   be here forever.  We have got everyone in attendance.

18          Do either of you have any -- either side have any

19   objection?

20          MR. GHOSE:  No objection, Your Honor.

21          MR. NORTON:  That would be normal course anyway if

22   they are about to go deliberate; right?

23          THE COURT:  Well, if it is a trial where we think

24   things may go on and we have had trouble with attendance, I

25   would keep the jurors -- the alternate jurors present.

```
 1              COURTROOM DEPUTY CLERK:  I can keep them in the jury

 2    lounge.

 3              THE COURT:  They can be kept in the jury lounge if

 4    you want when they go down to lunch.

 5              MR. GHOSE:  Yeah, we would ask that they be kept in

 6    the jury lounge.  But, obviously, they can't deliberate.

 7              THE COURT:  All right.  That's fine.  Sometimes they

 8    prefer that because they like to go back and talk to their

 9    fellow jurors about the verdict also.  That is fine.

10              I'm even -- if they have a question, I'm not

11    answering it for an hour.

12                        (A lunch break was taken.)

13                        (Deliberations began at 2:00 P.M.)

14                        (The proceedings reconvened at 4:04 P.M., as

15                        follows:)

16              THE COURT:  Hello.  Have a seat.  So I have a note

17    from the jury.  It says, if he knew that guns were being used

18    during the robbery, when was the last point he could have

19    walked away and not been charged with this particular crime?

20    Can we watch the video from start to finish?  Signed by the

21    foreperson.

22              So I'll have the jury in.  Yes, they can watch the

23    video, first of all.  And they can watch it in here.  And

24    Ms. McConochie can stop it at any point for them.  And I'll

25    just tell them to not converse while she's present.  And, of
```

 1    course, they can huddle around the little computer later on if

 2    they want to take it back.

 3            And then in respect to the question when was the --

 4    as to when was the last point he could have walked away, I'm

 5    going to -- my proposal is to tell them that is for them to

 6    determine based on the totality of the evidence in front of

 7    them.

 8            MR. NORTON:  I think that is the law.

 9            THE COURT:  Any objections to the way of proceeding

10    that I've suggested?

11            MR. GHOSE:  No, Your Honor.

12            MR. NORTON:  No, Your Honor.

13            THE COURT:  All right.  Should we have the jury back

14    in?

15            I need to know whether there is one continuous

16    exhibit or --

17            MR. GHOSE:  No, there isn't.  There are six different

18    videos.

19            THE COURT:  How will they know which ones?

20            MR. GHOSE:  I'm not sure which one they want to

21    watch.  I mean, there is the one of the front door.  And then

22    there's five from the interior.

23            THE COURT:  Just one second.

24            Then there's five what?

25            MR. GHOSE:  Five behind the teller counter.  It is

1   Exhibit 7 through 12.  The relevant parts are really under a

2   minute long for each video.  I mean, they are four minutes long

3   total.

4           THE COURT:  But they were trying to watch the video

5   from start to finish.  Is there a video from start to finish?

6           MR. GHOSE:  They all are from start to finish.  It is

7   just that on some of the videos the action only occurs for one

8   minute out of the four minutes.  So they are going to sit there

9   watching nothing happen for a couple of minutes.

10          THE COURT:  All right.  Is there one that shows it

11  from start to finish?

12          MR. GHOSE:  There is the one that shows -- I mean,

13  you have seen them, Your Honor.

14          THE COURT:  I know.  I just don't know --

15          MR. GHOSE:  Exhibit 7 is the -- well, actually I'm

16  not sure.  I'm not sure which is which.  I would have to look

17  at my list.  But one shows the front door.  One shows behind

18  the counter.  And the others just show the various teller

19  counters.

20          THE COURT:  One is from the front door.  One from the

21  counter.

22          MR. GHOSE:  There's one that shows the front door.

23  There's one that shows behind the counter, like the floor area

24  where the safe is.  And then there are four that show each of

25  the different teller positions.

```
1              THE COURT:  Okay.  And do they go for the whole --
2     even if they don't show anything of interest for five minutes
3     or four?
4              MR. GHOSE:  Yeah.  Each video is a four-minute
5     segment.  But the robbery only took place -- the robbery only
6     took under two minutes.  So I wouldn't even bother with the
7     second half of any videos.  I would suggest that they just
8     watch the first two minutes of each of the six videos.
9              MR. NORTON:  It is about two minutes.
10             MR. GHOSE:  Two minutes, 30 seconds.
11                  (There was a brief pause in the proceedings.)
12             THE COURT:  What does 4:10 mean when it says
13    something starts at 4:10?  Is that just --
14             COURTROOM DEPUTY CLERK:  Surveillance video camera
15    three starting 4:10.
16             MR. GHOSE:  Yeah.  That is sort of like before the --
17    before the videos were excerpted, that was like my note to
18    myself about what part of the video the relevant points start.
19             THE COURT:  All right.  Do you all mind my telling
20    the jury that the length is two minutes -- what did you say?
21             MR. NORTON:  It appears to be right at two minutes,
22    almost 30 seconds from the time it appears that people are
23    seeing the people come in the bank until the time they appear
24    to have gone.
25             THE COURT:  Is that correct?
```

1          MR. GHOSE:  That sounds correct to me, yes.

2          THE COURT:  Okay.  And so these are fragments of the

3   two minutes, 30 seconds, or are they two minutes, 30 seconds

4   but you just don't see anything for parts of the time?

5          MR. GHOSE:  I can give you a little more detail.  So,

6   Your Honor, Exhibit 11 is the video that shows the front door.

7   That is about a four-minute video, three-minute video.  But the

8   relevant part is about two minutes and 30 seconds.  I would

9   suggest showing that one first.

10          The next one that I would suggest showing is Exhibit

11   Number 8.  That is the teller camera behind Vada, who is the

12   witness who was approached by Mr. Adeleye.  That is about --

13   again, that is only -- that is under three minutes long -- that

14   one.  And the first two minutes and 30 seconds would be the

15   relevant portion.

16          The one I would suggest showing next is Exhibit

17   Number 10.  That shows behind the counter, and it sort of shows

18   the floor area.  But that is three minutes long, and most of

19   that is relevant.

20          THE COURT:  Okay.

21          MR. GHOSE:  The last three videos don't show a whole

22   lot, frankly.  But you can still play them.  Exhibit 9,

23   Exhibit 12, and Exhibit 7.  They show the teller stations that

24   are either unoccupied or occupied by the other teller who

25   didn't testify.

1          THE COURT:  Okay.  Very good.  Do you have any

2    objections to that suggestion?

3          MR. NORTON:  No, Your Honor.

4          THE COURT:  All right.

5          MR. GHOSE:  Your Honor, do you want me to play them,

6    or do you want to play them from the actual exhibits that are

7    in evidence?  Because I have my computer and I could play them.

8          THE COURT:  I think I need to just allow

9    Ms. McConochie to play them outside all of our presence for

10   them so they can -- even if they are nudging each other that

11   they can nudge each other and do whatever, unless there are

12   objections to that.

13         MR. GHOSE:  No, Your Honor.

14         THE COURT:  If she has trouble with the video,

15   then --

16         MR. MOULTRIE:  Do you want us to wait?

17         THE COURT:  No.

18         **(The jury entered the courtroom at 4:17 P.M.)**

19         THE COURT:  Ladies and gentlemen, I have your

20   message.  I'm sorry it has taken a little while to get back to

21   you.  I always try to consult with counsel to give them an

22   opportunity to express their opinion before I speak to you

23   about a matter like this.

24         Yes, you can watch the video.  And which there are

25   apparently six videos.  And, you know, they are from different

1    perspectives.  And the parties have authorized me to tell you

2    that the video -- the whole action from start -- from entry

3    until the end of departure lasts approximately two minutes and

4    30 seconds.  They are longer than that, so there is sometimes

5    no action.  So they have given me a suggested sequence with the

6    front door -- video of the front door -- from the front door

7    perspective being the first one; the one from the teller's

8    perspective, the first witness, Vada, being next; the next one

9    being behind the counter at the floor level; and then the last

10   two, which you may or may not want to look at -- and you can

11   stop at any point.  Of course, that is up to you -- being from

12   the teller -- other teller stations.  Some of which were

13   unoccupied.

14          So some of the times you're not going to see that

15   much from some of them.  But we have tried to -- that order is

16   so that you will see the most, and you can see all of them

17   obviously.

18          Our thought was that maybe so that you're not

19   huddling around the little laptop, all 12 of you, that I would

20   excuse everyone from the courtroom, other than Ms. McConochie,

21   and she would show them, and you could -- any of you could ask

22   her to stop at any time.

23          But we would ask you not to discuss it while

24   you're -- while she is present in order to ensure the

25   confidentiality of your discussions.  And then you can always,

1    if you feel like you need to, bring it back on the laptop and

2    say, this is what I'm talking about.  You can do that.  But

3    this way everyone can see it together.

4           If you would prefer just to take the laptop back, you

5    can do that also.  So yes, you can look at it.

6           As to the other question, which was, if he knew that

7    guns were being used during the robbery, when was the last

8    point he could have walked away and not been charged with the

9    particular crime?

10          Well, actually that is for you to decide based on the

11   totality of evidence in front of you.  That is precisely what

12   the jury has to decide.  And, obviously, you're not the ones

13   charging but you're finding that -- making that finding.

14          So do you want to just go back for a second and

15   decide whether you want to look at it as a group in here or the

16   laptop back or --

17          UNIDENTIFIED JUROR:  Watch it here.

18          THE COURT:  All right.  We have our marching orders

19   then.  So if Ms. McConochie has any trouble, she will get in

20   touch with you all to show them.

21          COURTROOM SECURITY OFFICER:  All rise.  Court is in

22   recess.

23          THE COURT:  I just had one last thing to say.  You

24   can stay as long as you want today in terms of your

25   deliberations, and, of course, you can come back tomorrow

1    morning.  Whatever you want.

2          UNIDENTIFIED JUROR:  If we come back tomorrow, is

3    there a certain time we need to back in the morning or could

4    we --

5          THE COURT:  No.  You could decide you want to come

6    back a little bit later if that is more convenient.  You can

7    judge how much you have to do to work out.  Just let me know

8    because I think tomorrow, in fact, I probably won't be here

9    until 10:15 myself.  All right.

10                    **(The proceedings were adjourned at 4:21 P.M.,**

11                    **and the jury continued their deliberations**

12                    **until 5:22 P.M.)**

13

14

15

16

17

18

19

20

21

22

23

24

25

```
 1                    C E R T I F I C A T E

 2

 3   UNITED STATES OF AMERICA

 4   NORTHERN DISTRICT OF GEORGIA

 5

 6        I, SHANNON R. WELCH, RMR, CRR, Official Court Reporter of

 7   the United States District Court, for the Northern District of

 8   Georgia, Atlanta Division, do hereby certify that the foregoing

 9   463 pages constitute a true transcript of proceedings had

10   before the said Court, held in the City of Atlanta, Georgia, in

11   the matter therein stated.

12        In testimony whereof, I hereunto set my hand on this, the

13   17th day of March, 2017.

14

15

16

17                              _____
                                SHANNON R. WELCH, RMR, CRR
18                              OFFICIAL COURT REPORTER
                                UNITED STATES DISTRICT COURT
19

20

21

22

23

24

25
```